# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DC ASSOCIATION OF CHARTERED ) | |
| PUBLIC SCHOOLS ) | |
| 1351 Nicholson Street, Suite 215-217 ) | No. 1:14-cv-_____ |
| Washington, D.C. 20011, ) | |
| ) | |
| EAGLE ACADEMY ) | |
| PUBLIC CHARTER SCHOOL ) | |
| 475 School Street, S.W. ) | |
| Washington, D.C. 20024, ) | |
| ) | |
| and ) | |
| ) | |
| WASHINGTON LATIN ) | |
| PUBLIC CHARTER SCHOOL ) | |
| 5200 2nd St. N.W ) | |
| Washington, D.C. 20011 ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| THE DISTRICT OF COLUMBIA ) | |
| 1350 Pennsylvania Avenue, N.W. ) | |
| Washington, D.C.  20004, ) | |
| ) | |
| VINCENT GRAY ) | |
| in his official capacity as Mayor ) | |
| of the District of Columbia ) | |
| 1350 Pennsylvania Avenue, N.W. ) | |
| Washington, D.C.  20004, ) | |
| ) | |
| and ) | |
| ) | |
| JEFFREY S. DEWITT, ) | |
| in his official capacity as Chief Financial Officer ) | |
| of the District of Columbia ) | |
| 1350 Pennsylvania Avenue, N.W. ) | |
| Washington, D.C.  20004 ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT**

Plaintiffs, by and through their undersigned counsel, file this complaint for declaratory judgment and injunctive relief against Defendants, the District of Columbia, Mayor Vincent Gray, and Chief Financial Officer Jeffrey DeWitt ("Defendants" or "D.C. Government"), and in support thereof allege the following:

**INTRODUCTION**

1.      This case challenges Defendants' systematic and continuing failure to equally fund the educations of the nearly 37,000 children who attend public charter schools in the District of Columbia, in violation of the United States Constitution, 42 U.S.C. § 1983, the D.C. Home Rule Act, and the D. C. School Reform Act of 1995.  In the D.C. School Reform Act of 1995 ("School Reform Act"), D.C. Code § 38-1800.01, *et. seq.*, Congress expressly required that students who attend public charter schools ("D.C. Charter Schools") receive the same level of educational funding from local revenues, calculated on a per-student basis, as students who attend the traditional public school system, District of Columbia Public Schools ("DCPS").  As a result of laws enacted by the D.C. Council and various administrative actions undertaken by Defendants, however, every year the District of Columbia spends, on average, $1,600-$2,600 *less* in educational funding for each D.C. Charter School student than it spends on his or her DCPS counterpart.  Indeed, even an education adequacy study recently commissioned by Defendants found that the funding of DCPS and D.C. Charter Schools was inequitable and recognized that many of Defendants' actions violate the School Reform Act's requirement of "uniform funding of operating expense for both DCPS and public charter schools."

2.      In the early 1990s, public education in the District was in crisis.  The D.C. Government routinely failed to budget adequately for education costs, leaving schools unable to fund basic operations and, in some instances, leaving District children without adequate teachers,

books, or facilities.  Funding for D.C. public education had become a "political football" in the yearly budgeting process, subject to the whims of the Mayor and D.C. Council.[1]

3.      To address these serious systemic problems, in 1996, Congress exercised its constitutional authority to act as the exclusive legislature for the District and enacted the D.C. School Reform Act, a comprehensive reform of D.C. public education that was signed into law by President Clinton on April 26, 1996.  Through the School Reform Act, Congress authorized the establishment of D.C. Charter Schools to provide District parents with an alternative to the District's traditional public schools.  At the same time, Congress expressly required uniform funding for similarly situated students attending DCPS and D.C. Charter Schools.

4.      Specifically, the School Reform Act requires Defendants to develop and apply a uniform per-student funding formula that:  (i) includes all operating expenses for both DCPS and D.C. Charter Schools; (ii) establishes a uniform dollar amount of per-student funding for similarly situated students; and (iii) calculates the annual payment to DCPS and each of the D.C. Charter Schools by multiplying the uniform per-student dollar amount by the number of students enrolled in DCPS and each D. C. Charter School.  Through this uniform funding requirement, the School Reform Act sought to ensure that similarly situated students would receive the same level of local public funding for their public education, regardless of whether they attend DCPS or a D.C. Charter School.  Congress made clear that a "uniform formula will be used to provide operating budgets on the basis of enrollment for the school system as a whole and for individual public charter schools," and that "[t]he same formula will be used for students enrolled in individual public charter schools . . . and [DCPS Schools]."  H.R. 104-455, 104th Cong. 2d Sess. January 31, 1996 at 143-44, 146.

[1] *Testimony of Karen Shook,* President, D.C. Board of Education, before the Senate Appropriations Subcommittee on the District of Columbia, June 27, 1996 (1996 WL 353916 (F.D.C.H.)).

5.      Notwithstanding this clear Congressional mandate, through laws enacted by the D.C. Council and other actions that unlawfully conflict with and violate the School Reform Act's uniform funding requirement and violate the U.S. Constitution and the District of Columbia Home Rule Act, Defendants have failed to provide hundreds of millions of dollars in funding to D.C. Charter Schools.  These laws and actions, which result in unequal funding for students attending D.C. Charter Schools, include:

   a.      ***Enrollment Calculations***: Defendants fail to provide D.C. Charter Schools with uniform per-student funding when they fund D.C. Charter Schools based on actual, audited student enrollment and reduce funding to D.C. Charter Schools if actual enrollment is lower than projected, while funding DCPS based on projected, and often inflated, student enrollment (the "Enrollment Calculations");

   b.      ***Supplemental Funding***: Defendants fail to provide D.C. Charter Schools with uniform per-student funding when they fund certain DCPS operating expenses by providing supplemental funding outside the uniform per-student funding formula without accounting for such funding in calculating the per-student payments made to D.C. Charter Schools for their operating expenses ("Supplemental Funding").  Supplemental Funding includes, but is not limited to, enacting legislation to provide supplemental appropriations to DCPS but not to D.C. Charter Schools (the "Supplemental Appropriations"), reprogramming and transferring to DCPS funds previously appropriated to other D.C. government agencies (the "Reprogrammings"), and paying DCPS's debts directly (the "Debt Payments");

c.    ***Annual Budget Funding***: Defendants fail to provide D.C. Charter Schools with uniform per-student funding when they fund certain DCPS operating expenses through the District's annual budget process without accounting for such funding in calculating the per-student payments made to D.C. Charter Schools for their operating expenses ("Annual Budget Funding"). Annual Budget Funding includes, but is not limited to, intra-district transfers of funds from other D.C. agencies to DCPS (the "Intra-District Transfers"), line items in the District's annual budget that are allocated to other D.C. government agencies for services those agencies provide to DCPS without charge (the "Line Items"), and funding DCPS pension fund payments (the "Pension Payments"); and

d.    ***Subsidized Services***: Defendants fail to provide D.C. Charter Schools with uniform per-student funding when they fund certain DCPS operating expenses through subsidies of services provided to DCPS and do not account for those subsidies in calculating the per-student payments made to D.C. Charter Schools for their operating expenses (the "Subsidized Services").

6.    Because these legislative enactments and actions by Defendants conflict with the School Reform Act's uniform funding requirement, they exceed the D.C. Government's authority under the Home Rule Act, violate the Supremacy Clause of the United States Constitution, and violate the School Reform Act's uniform funding provisions.

7.    Accordingly, Plaintiffs seek (i) a judgment declaring unlawful those D.C. laws and practices that conflict with and violate the School Reform Act's uniform funding requirement; and (ii) an injunction requiring Defendants to comply with the School Reform

Act's uniform funding requirement by funding all DCPS and D.C. Charter School operating expenses through a uniform funding formula to ensure that students who attend public charter schools receive the same level of public educational funding, calculated on a per-student basis, as students who attend DCPS.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  This action arises under the Constitution and the laws of the United States, including 42 U.S.C. § 1983, as well as under Section 1-206.01 of the District of Columbia Home Rule Act. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367.  Under 28 U.S.C. §§ 2201-2202, the Court may issue a declaratory judgment and other necessary or proper relief.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

10.     The D.C. Association of Chartered Public Schools ("DCACPS" or "the Association") is a nonprofit association organized under the laws of the District of Columbia. The Association's primary purpose is to support the development, growth, and sustainability of quality public charter schools in the District of Columbia.  Pursuant to DCACPS's Articles of Incorporation and Bylaws, DCACPS is a membership organization.  Its members include 39 of the District's Public Charter Schools.  These charter school members elect and serve on the Association's Board of Directors, participate in periodic membership meetings, and help finance the Association's activities through payment of annual membership dues, which allows the Association to pool resources and advocate on their behalf.

11.     Eagle Academy Public Charter School ("Eagle Academy") is a nonprofit corporation organized under the laws of the District of Columbia.  It has two campuses – one located at 3400 Wheeler Rd., SE, Washington, D.C. in the District's Ward 8 and another located

at 1017 New Jersey Avenue, SE, Washington, D.C., in Ward 6.  Eagle Academy serves 892

students in grades pre-k3 through 3rd grade.  Founded in 2003, Eagle Academy is Washington

D.C.'s first exclusively early childhood public charter school and first early childhood school in

the District fully accredited by the Middle States Association for the Accreditation of Schools,

Colleges, and Universities.  It is a member of the Association.

12.      Washington Latin Public Charter School is a nonprofit corporation organized

under the laws of the District of Columbia.  It has one campus located at 5200 2nd St., NW,

Washington, D.C in the District's Ward 4.  Washington Latin serves 640 students in grades 5

through 12.  Founded in 2006, Washington Latin provides students in the District a unique

opportunity to obtain a classical education with emphasis on the language, literature, and culture

of the ancient world.  Washington Latin is accredited by AdvancED and is a member of the

Association.

13.      The District of Columbia is a municipal corporation established by Congress by

Act of February 21, 1871, ch. 62, 16 Stat. 419, § 1.

14.      Vincent Gray is the Mayor of the District of Columbia and is named in his official

capacity.  Under the School Reform Act, "the Mayor [of the District of Columbia] shall make

annual payments from the general fund of the District of Columbia in accordance with the

formula."  D.C. Code § 38-1804.01(a).

15.      Jeffrey S. DeWitt is the Chief Financial Officer of the District of Columbia and is

named in his official capacity.  Defendant DeWitt is the head of the Office of the Chief Financial

Officer, an independent entity of the District of Columbia government established for the

purposes of overseeing the revenue and finances of the District of Columbia government.

Defendant DeWitt's responsibilities include: oversight and direct supervision of the financial and

budgetary functions of the District government; preparing the District of Columbia's annual

budget; representing the District of Columbia in the federal appropriations process; certifying

DCPS's alleged need for supplemental funding in order to allegedly comply with federal and

D.C. anti-deficiency statutes; paying all financial obligations of DCPS; and monitoring the

District's budget performance during the fiscal year.

## ALLEGATIONS OF FACT
## (COMMON TO ALL COUNTS)

**A.** **Congress Has Authority to Act As the Exclusive Legislature for the District.**

16.    The United States Constitution gives Congress "exclusive" legislative authority

over the District of Columbia. *See* U.S. Const. art. I, § 8.  Congress's power over the District is

plenary.  It may exercise within the District all legislative powers that a state legislature may

exercise within a state.  The United States Constitution further provides that Acts of Congress

"shall be the supreme law of the land."  U.S. Const. art. VI, cl. 2.

17.    In 1973, Congress enacted the District of Columbia Self-Government and

Governmental Reorganization Act, known as the "Home Rule Act."  Pursuant to the Home Rule

Act, Congress delegated some, but not all, of its legislative authority over the District to the D.C.

Council.  Pursuant to Section 1-206.01 of the Home Rule Act, Congress expressly reserved the

right to exercise, at any time, its constitutional authority to act as the exclusive legislature for the

District.  D.C. Code § 1-206.01.

18.    Accordingly, under the Home Rule Act, the legislative power of the D.C. Council

extends to all rightful subjects of legislation, consistent with the Constitution, *see* D.C. Code § 1-

203.02, and subject to Congress's reservation of constitutional authority to act as the exclusive

legislature for the District.

B.    **Congress Authorizes Establishment of Public Charter Schools in the District and Requires Uniform Per-Student Funding for all D.C. Public Schools.**

19.    In the early 1990s, public education in the District was failing students and parents.  The District's failure to budget adequately for education costs required regular reallocation of funds from D.C. government agencies to DCPS in order to fund basic operations. Studies showed that the District's failure to implement long-term education and operational plans left students in some cases without teachers, classrooms, or textbooks, or with teachers who were untrained and uncertified.  The Mayor and the D.C. Council's funding of D.C. public education was politically motivated and unpredictable.

20.    To address these concerns, Congress enacted the School Reform Act and authorized the establishment of the first public charter schools in the District of Columbia. Congress viewed public charter schools as a way to provide parents and students in the District with educational alternatives and to increase choices by allowing a more diverse mix of educational programs, incorporating innovative teaching and testing approaches, and promoting community and parent involvement in public education.  *See* 142 Cong. Rec. S 1322, Feb. 27, 1996.

21.    D.C. Charter Schools are public schools.  Like DCPS, they are funded through local tax revenues.  They are non-selective, required to admit applicants without screening of any kind.  D.C. Code § 1802.06.  D.C. Charter Schools also are required to provide special educational and limited-English services in compliance with all federal and state laws and regulations.   D.C. Code § 1802.04(c)(5).  Finally, all D.C. Charter Schools must comply with all civil rights and health and safety laws.  D.C. Code § 1802.04(c)(4),(5).

22.    In addition to establishing public charter schools as an alternative to traditional public schools, Congress sought to ensure that students attending the newly established D.C. Charter Schools would receive the same level of public funding as their DCPS counterparts.  The

purpose of requiring uniform funding for DCPS and D.C. Charter Schools was twofold: (i) to provide adequate funding to the D.C. Charter Schools and "ensure that a two-tiered system of public schools would not result;" and (ii) to "clarify and focus decisions regarding funding for public education around students' needs."  141 Cong. Rec. H1 1704-03, Nov. 2, 1995 (1995 WL 642540); *see also* H.R. 104-455, 104th Cong. 2d Sess. January 31, 1996 at 146.

23.     To that end, Congress established a uniform per-student funding requirement.  As Congress explained, a "*uniform formula will be used to provide operating budgets on the basis of enrollment for the school system as a whole and for individual public charter schools*," and "[t]he same formula will be used for students enrolled in individual public charter schools . . . and [DCPS Schools]."  H.R. 104-455, 104th Cong. 2d Sess. January 31, 1996 at 143-44, 146 (emphasis added).

24.     The School Reform Act therefore directs Defendants to establish a formula to determine the annual payments to DCPS and D.C. Charter Schools for operating expenses, and expressly requires that those payments "be calculated by multiplying a *uniform* dollar amount used in the formula" by the number of students enrolled at DCPS and the number of students enrolled at each D.C. Charter School.  D.C. Code § 38-1804.01(b)(1)-(2) (emphasis added).  The School Reform Act then mandates that the Mayor "shall make annual payments from the general fund of the District of Columbia in accordance with the formula."  D.C. Code § 38-1804.01(a).

25.     Congress made clear that this uniform per-student funding formula was to apply to and include all DCPS and D.C. Charter School operating expenses, both at the individual school and system level:

> [T]he funding formula and annual payments derived from per pupil allocations to both public charter schools and public schools . . . must include the total costs of . . . operations of the Board of Education itself, all central administration and central office costs, including those applicable to the Superintendent of Schools, all facilities operating costs, including utilities, all local education agency evaluation, assessment, and

> monitoring costs, and any other direct or indirect costs normally incurred by, or allocated to, schools under the control of the Board of Education and the overall public school system.

H.R. Rep. 104-689, 104th Cong. 2nd Sess. 1996, at 50.  Thus, the School Reform Act requires that the District of Columbia enact and adhere to a uniform per-student funding formula to serve as the exclusive mechanism for funding operating expenses for DCPS and D.C. Charter Schools.

26.     In response to this Congressional mandate, the D.C. Council passed the Per Student Funding Formula for Public Schools and Public Charter Schools Act of 1998, known as the Uniform Per-Student Funding Formula ("UPSFF").  *See* D.C. Code §§ 38-2901 to 38-2912.

27.     Statements made by officials demonstrate that the D.C. Government understood that the School Reform Act mandated the distribution of all operating expenditures on a uniform, per-student basis.  As Gregory McCarthy, the Deputy Chief of Staff of Policy and Legislative Affairs for the Executive Office of the Mayor of the District of Columbia, stated:  "In 1996, as directed by the DC School Reform Act, the District Council created and passed the initial version of the Uniform Per Student Funding Formula .… The Mayor has committed to fully fund education through the Formula."  Testimony of Gregory McCarthy before the Committee on Government Reform, Subcommittee on the District of Columbia at 3 (Dec. 7, 2001).

### C.     District Laws and Defendants' Actions Violate, Conflict With, and Unlawfully Amend the School Reform Act's Uniform Funding Requirement.

28.     Defendants have continuously and systematically deprived D.C. Charter Schools, and the students who attend those schools, of hundreds of millions of dollars in operating expenses that they are entitled to receive pursuant to the School Reform Act's uniform funding requirement.  Since fiscal year 2008, through the actions described below, Defendants have failed to provide D.C. Charter Schools with uniform per-student funding to match more than $770 million in funds that have been provided to DCPS for operating expenses, in direct conflict with the School Reform Act's uniform funding requirement.  As a result, D.C. Charter Schools

have received for each of their students, on average, $1,600 to $2,600 less each year than DCPS has received.

29.     Defendants' laws and actions that violate, conflict with, and unlawfully amend the School Reform Act include:

### a.  Enrollment Calculations

30.     Defendants fail to provide D.C. Charter Schools with uniform per-student funding when they fund D.C. Charter Schools based on actual, audited student enrollment and reduce funding to D.C. Charter Schools if actual enrollment is lower than projected, while funding DCPS based on projected, and often inflated, student enrollment.

31.     The School Reform Act requires that the funding for each D.C. Charter School and DCPS be based on the number of students enrolled in their schools.  D.C. Code § 38-1804.01(b)(2).  The District's UPSFF violates and conflicts with the School Reform Act because it allows Defendants to fund DCPS based on *projected* student enrollment, D.C. Code § 38-2906(a), while requiring that D.C. Charter School funding be based on *actual* student enrollment, as determined by an annual audit.  D.C. Code § 38-2906.02.

32.     Specifically, § 38-2906.02 of the UPSFF requires Defendants to audit each D.C. Charter School's student enrollment projections annually and to reconcile those numbers to reflect actual, audited student enrollment numbers as of October 5th each year.  If a D.C. Charter School's actual student enrollment is lower than it projected, its funding is reduced.  *See* D.C. Code § 38-2906.02(b).

33.     In contrast, though DCPS's enrollment is audited at the same time as the charter schools', the UPSFF does not require DCPS's enrollment projections to be reconciled to reflect actual student enrollment as shown by the audit.  Because funding for DCPS is not reconciled to reflect actual enrollment, the more students DCPS projects it will have, the more money

Defendants provide to it, regardless of whether DCPS's actual enrollment is significantly lower or bears any relationship to those projections.  Indeed, despite the fact that enrollment in DCPS has declined in 13 of the last 16 years since the School Reform Act became law, the audit for fiscal year 2012 shows that Defendants over-estimated general student enrollment by 2,056 students, and over-estimated special education and limited and non-English proficiency students by more than 500 students.  Similarly, for fiscal year 2013, DCPS over-estimated general enrollment by 1,617 students and special education enrollment by 1,324 students.  Finally, although DCPS under-estimated general enrollment for fiscal year 2014, it over-estimated special education enrollment by 686 students, resulting in more than $20 million in over-funding.

34.     Using the UPSFF's different methodologies for calculating student enrollment, Defendants have failed to provide uniform per-student funding to D.C. Charter Schools to match more than $165 million in additional operating expense funding provided to DCPS based on enrollment projections alone.  The additional operating expense funding provided to DCPS that was not accounted for in calculating the payments made to D.C. Charter Schools for their operating expenses has ranged from approximately $4 million to more than $44 million in each year from 2008 through 2014.

35.     As a result, during this seven-year period, Defendants have provided D.C. Charter Schools less funding, on a per-student basis, than they have provided to DCPS.

36.     Defendants' use of different methodologies for calculating student enrollment violates and conflicts with the School Reform Act's uniform funding requirement by failing to provide D.C. Charter Schools with equivalent funding, on a per-student basis, as that provided to DCPS.

37.     To the extent that Defendants have relied on the different enrollment calculation methodologies provided in §§ 38-2906(a) and 38-2906.02 of the UPSFF to fund DCPS operating

expenses without providing equivalent, per-student funding to D.C. Charter Schools, those provisions unlawfully amend and conflict with § 38-1804.01(b) of the School Reform Act.

### b. Supplemental Funding

38.     Defendants also fail to provide D.C. Charter Schools with uniform per-student funding when they fund DCPS operating expenses by providing Supplemental Funding to DCPS outside a uniform per-student funding formula and do not account for such funding in calculating the per-student payments made to D.C. Charter Schools for their operating expenses.

39.     Although the School Reform Act requires Defendants to fund all operating expenses through a uniform funding formula, since fiscal year 2008, Defendants have used Supplemental Funding to distribute to DCPS more than $140 million in additional operating expense funding without providing equivalent, per-student funding to D.C. Charter Schools.  The additional operating expense funding provided to DCPS that was not accounted for in calculating the payments made to D.C. Charter Schools for their operating expenses has ranged from approximately $14 million to nearly $80 million each year from 2008 through 2012.

40.     Defendants have provided Supplemental Funding for DCPS operating expenses, outside the UPSFF, through various actions including, but not limited to, Supplemental Appropriations, Reprogrammings, and Debt Payments.

41.     *Supplemental Appropriations*:  Defendants have enacted supplemental appropriations to provide additional operating expense funding to DCPS, outside the UPSFF, without providing additional supplemental per-student funding to D.C. Charter Schools.

42.     For example, through the Fiscal Year 2008 Supplemental Emergency Act of 2007, Defendants provided more than $43 million in additional funding to DCPS for operating expenses such as "extra-duty pay," and "additional instruction materials," D.C. Reg. Vol. 55 at 967, Feb. 1, 2008.  No additional per-student funding was provided to D.C. Charter Schools.

43.     Through the Fiscal Year 2012 Second Revised Budget Request Emergency Adjustment Act ("2012 Revised Budget Request Act"), Defendants provided more than $25 million in funding to DCPS for operating expenses, such as staff salaries, food services, and after-school programs.  No additional, per-student funding was provided to D.C. Charter Schools.

44.     Despite D.C. Charter Schools' repeated requests that the foregoing legislation include the pro-rata, per-student funding they are entitled to receive under the School Reform Act's uniform funding requirement, Defendants provided no additional, per-student funding for D.C. Charter Schools.  Instead, the 2012 Revised Budget Request flatly asserted:

> Notwithstanding the Uniform Per Student Funding Formula for Public Schools and Public Charter Schools Act of 1998, effective March 26, 1999, … and the District of Columbia School Reform Act of 1995, approved April 26, 1996, … the allocations contained in section 2 shall not be construed to create an obligation to provide additional funding to any local education agency except the District of Columbia Public Schools.

Fiscal Year 2012 Second Revised Budget Request Emergency Adjustment Act, Section 4 (internal citations omitted).  Each D.C. Charter School is a local education agency.

45.     *Reprogrammings*:  The Mayor has at various times submitted requests to the D.C. Council to transfer or "reprogram" funds previously allocated to one D.C. agency to another agency, such as DCPS.

46.     Upon information and belief, since at least 2008, Defendants have utilized Reprogrammings to provide DCPS with additional funding to cover DCPS operating expenses without providing equivalent, per-student funding to D.C. Charter Schools for their operating expenses.

47.     *Debt Payments*:  Upon information and belief, since at least 2008, Defendants have provided supplemental funding for DCPS operating expenses simply by paying DCPS's

debts directly or covering DCPS's overspending without accounting for these payments in calculating the per-student payments made to D.C. Charter Schools for their operating expenses.

48.     These legislative enactments and administrative actions conflict with and violate the School Reform Act's uniform funding requirement by failing to provide D.C. Charter Schools with equivalent funding, on a per-student basis, as that provided to DCPS.

### c. Annual Budget Funding

49.     Defendants also fail to provide D.C. Charter Schools with uniform per-student funding when, during the annual budget process, they fund certain DCPS operating expenses outside a uniform per-student funding formula.

50.     Each year the D.C. Council enacts legislation establishing the District's budget for the upcoming fiscal year (the "D.C. Budget Acts").  Although the School Reform Act requires Defendants to fund all operating expenses through a uniform funding formula, in the D.C. Budget Acts, Defendants have provided additional funding for DCPS operating expenses, outside the UPSFF, through various actions including, but not limited to, Intra-District Transfers, Line Items, and Pension Payments.

51.     *Intra-District Transfers*:  The D.C. Budget Acts for fiscal years 2008 through 2015 contained intra-district transfers of funds from the Office of State Superintendent for Education ("OSSE") to DCPS that provided DCPS more than $35 million in additional funding to support DCPS's compliance with federal laws requiring the provision of services to students with disabilities.  Although D.C. Charter Schools have the same obligations under federal law, they received no additional funding for these operating expenses and were required to cover the costs of providing these services out of their own operating budgets.

52.     *Line Items*:  For fiscal years 2008 through 2015, Defendants have specifically allocated funds to the D.C. Office of the Attorney General and to the D.C. Department of

General Services to pay for legal services and facilities maintenance services these agencies respectively provide to DCPS.[2]  Over the last the last eight years, DCPS will have received the equivalent of approximately $316 million in additional funding for these operating expenses.

53.     Although these and other services provided in this manner are operating expenses that already are accounted for and included in the annual payment DCPS receives under the UPSFF, and that DCPS normally would be required to fund out of its operating budget, DCPS receives these services without charge.

54.     In contrast, D.C. Charter Schools have not received from the D.C. Government comparable additional funding to cover the same types of operating expenses.

55.     *Pension Payments*:  Although teacher pension payments are typical public school operating expenses, each year, through the D.C. Budget Acts, Defendants fund DCPS's teacher pension payments, outside the UPSFF, through a separate budget appropriation to the Teacher Retirement System.  Over the last eight years, DCPS will have received the equivalent of more than $92 million in additional funding for these operating expenses.

56.     While pension payments for DCPS's teachers and other instructional staff are covered through a separate appropriation in the D.C. Budget, and DCPS does not have to cover these operating expenses, D.C. Charter Schools must cover the costs of pension payments for its teachers and other instructional staff out of the operating funding they receive through the UPSFF.  Moreover, if a teacher leaves DCPS to teach at a D.C. Charter School, the teacher can elect to have the Charter School pay into the DCPS retirement fund at the DCPS rate, which is considerably higher than contributions made by D.C. Charter Schools under their 403(b) plans.

---

[2] Facilities maintenance services were formerly provided by the District of Columbia Office of Public Education Facilities Modernization, which is now part of the Department of General Services.

57.     All of these legislative enactments and administrative actions made in connection with Annual Budget Funding provided to DCPS conflict with and violate the School Reform Act's uniform funding requirement by failing to provide D.C. Charter Schools with equivalent funding, on a per-student basis, as that provided to DCPS.

58.     To the extent that Defendants have relied on § 38-2906.02(b) of the UPSFF (which states that the UPSFF does not apply to "funds appropriated to other agencies and funds of the District government") to fund these DCPS operating expenses outside the UPSFF without providing equivalent, per-student funding to D.C. Charter Schools, that provision unlawfully amends and conflicts with § 38-1804.01(b) of the School Reform Act.

### d.  Subsidized Services

59.     Defendants also fail to provide D.C. Charter Schools with uniform per-student funding when they fund certain DCPS operating expenses by having other D.C. government agencies subsidize services provided to DCPS and do not account for the subsidies in calculating the per-student payments made to D.C. Charter Schools for their operating expenses.

60.     At least since 2008, for example, the D.C. Metropolitan Police Department ("MPD") has subsidized security guards provided to DCPS.  Pursuant to legislation and a memorandum of agreement, MPD assumed responsibility for procuring and administering the security guard contract at DCPS schools.  D.C. Code § 5-132.01, *et. seq.*  Although DCPS paid MPD for the cost through an intra-district transfer, the contract was entered at a substantially higher cost with the difference paid by MPD out of its own operating budget, with no additional charge to DCPS.

61.     Through this process, DCPS has received the equivalent of at least an additional $12 million in funding for operating expenses.

62.     Although D.C. Charter Schools also have security guards at their schools, they received no additional funding for these operating expenses.  These actions conflict with and violate the School Reform Act's uniform funding requirement by failing to provide D.C. Charter Schools with equivalent funding, on a per-student basis, as that provided to DCPS.

### C.     D.C. Charter Schools Have Not Received the Uniform Per-Student Funding To Which They Are Entitled Under the School Reform Act.

63.     Defendants' failure to comply with the School Reform Act's uniform funding requirement has created an unlawful disparity in per-student funding between D.C. Charter Schools and DCPS.

64.     Under the School Reform Act's uniform funding requirement, D.C. Charter Schools are entitled to receive, for their operating expenses, the same amount of funding per-student that DCPS receives for similarly situated students.

65.     Through the unlawful legislative enactments and administrative actions described above, since fiscal year 2008, Defendants have provided DCPS more than $770 million in funding for operating expenses without providing D.C. Charter Schools equivalent, per-student funding for their operating expenses.[3]

66.     Using DCPS's actual enrollment for the period 2008 through 2014, DCPS has received approximately $2,150 more per student, each year, than D.C. Charter Schools.

67.     During the same time period, the Association's public charter school members enrolled between nearly 16,000 and 28,000 students in any given year.  Accordingly, under the School Reform Act's uniform funding requirement, the Association's charter school members

---

[3] This amount does not include, for example, supplemental funding that DCPS received in 2014 or will receive for 2015 and/or additional funding DCPS will receive as a result of over-estimating student enrollment for 2015.

were entitled to receive an estimated $299 million in additional funding for their operating expenses.

68.     Similarly, during this time period, Plaintiff Eagle Academy Public Charter School enrolled between 296 and 892 students in any given year and, therefore, was entitled to receive an estimated $8.2 million in additional funding for its operating expenses.  Plaintiff Washington Latin Public Charter School enrolled between 300 and 640 students in any given year and, therefore, was entitled to receive an estimated $5.8 million in additional funding for its operating expenses.

69.     The Association's charter school members, Plaintiffs, other D.C. Charter Schools, and charter school advocates have repeatedly urged Defendants to eliminate the funding inequality that exists between DCPS and the D.C. Charter Schools by complying with the School Reform Act's requirement to fund all operating expenses for DCPS and D.C. Charter Schools through a uniform enrollment based funding formula.

70.     In 2010, Defendant Gray, then a member of the D.C. Council and Chairman of its Committee of the Whole, introduced an amendment to the District's UPSFF that would have required "that parity between DC public schools and charter schools be reached in the Fiscal Year 2012 budget."  Fiscal Year 2011 Budget Support Act of 2010, Committee of the Whole Report at 12-13.  Although the D.C. Council enacted this amendment, *see* D.C. Code § 38-2913 (2014), every year since, it has amended it to delay its implementation.  The current Fiscal Year 2015 Budget Support Act of 2014 again delays implementation until 2016.

71.     The District also established the Public Education Finance Reform Commission ("PEFRC" or the "Commission"), an independent commission to study and recommend revisions to the UPSFF to improve, among other things, the "maintenance of uniformity in funding between District of Columbia Public Schools ('DCPS') and public charter schools."  D.C. Code

§ 38-2914 (2014).  The legislation required PEFRC to provide the Council with an equity report

detailing, for fiscal years 2009 and 2010, the very types of inequitable payments and services at

issue in this Complaint, provide an analysis of the impact of those payments and services on

uniform funding, and provide recommendations for increased uniformity.  D.C. Code § 38-

2914(c)(1),(c)(2).

72.     The Commission's Equity and Recommendations Report for the Deputy Mayor

for Education on February 17, 2012 ("Equity Report") concluded that the District "provid[ed]

additional funding to DCPS" for functions that should have been funded by applying the UPSFF

and that such funding was provided "through supplemental appropriations, reprogrammings or

mid-year coverage of overspending or shortfalls in non-local revenues."  Equity Report at 19.

The Commission also found that DCPS received facilities maintenance and legal services from

other D.C. Government agencies even though funds for these operating expenses are included in

funding provided through the UPSFF, while D.C. Charter Schools were required to pay for these

services out of their operating budgets.  *Id*.

73.     The Association, its members, Plaintiffs, and other charter school leaders and

advocates urged Defendants to redress these funding inequities in the District's Fiscal Year 2013

Budget.  Defendants failed to do so.  Instead, Defendants commissioned a more in-depth study

and promised to address any funding-inequality issues following the recommendations of that

study.

74.     A 15-month study was conducted by The Finance Project in partnership with

Augenblick, Palaich and Associates.  On December 20, 2013, the "Cost of Student Achievement:

Report of the DC Education Adequacy Study Final Report" – commonly known as the

"Adequacy Study" – was issued and delivered to the D.C. Deputy Mayor for Education.  The

Adequacy Study concluded that education funding in the District "is inequitable" in that "DCPS

receives significantly more than public charter schools, in total and on a per-student basis."
Adequacy Study ES-15.

75.     Specifically, the Adequacy Study found that DCPS receives significant operating
expense funding outside the UPSFF through services provided by other D.C. government
agencies, including: the Office of the Attorney General for legal services; the Office of
Contracting and Procurement, for procurement services; the Office of the Chief Technology
Officer, for computer systems; and the Department of General Services, for facilities
maintenance.  Adequacy Study at 24.  The Adequacy Study concluded that for the 2013-2014
school year, DCPS would receive "more than twice as much [administrative service support from
other D.C. government agencies] on a per-student basis as public charter schools."  *Id*. at ES-12.

76.     The Adequacy Study recommended that all operating expenses for DCPS and
D.C. Charter Schools be funded through the UPSFF (with limited exceptions).  It recommended
that services and resources such as school nurses, social workers, technology systems,
procurement services, legal services and facilities maintenance services that had been provided
by D.C. government agencies should be funded through the UPSFF by requiring both DCPS and
D.C. Charter Schools to purchase these services using UPSFF-provided funds.  Adequacy Study
ES-23.

77.     Despite these findings and recommendations and Plaintiffs' repeated requests,
Defendants have refused to provide D.C. Charter Schools the uniform per-student funding to
which they are entitled under the School Reform Act.  The proposed Fiscal Year 2015 Budget
contains the same inequality in funding that has persisted over the last seven years, created
through the non-uniform funding practices identified above.

78.     Defendants' continuing disregard for the requirements of the School Reform Act demonstrates that the unlawful funding practices will continue absent an injunction and the declaratory relief requested below.

## CLAIMS FOR RELIEF

## COUNT I

**(Violation of Article I, Section 8 of the United States Constitution and The Home Rule Act)**

79.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 78 as though fully set forth herein.

80.     Article I, § 8 of the Constitution gives Congress the power to "exercise exclusive Legislation in all Cases whatsoever over" the District of Columbia.

81.     Although Congress delegated some of its legislative authority to the D.C. Council through the Home Rule Act, in Section 1-206.01, Congress expressly reserved the right to resume its role under the Constitution as the exclusive legislature for the District.  When Congress resumes its role as the exclusive legislature for the District of Columbia under Article I, § 8 of the Constitution in a subject area previously delegated under the Home Rule Act, the D.C. Council, thereafter, has no authority to enact legislation that conflicts with and effectively amends such Congressional legislation in a manner that is inconsistent with it or contrary to its purpose.

82.     In 1996, Congress exercised its authority under Article I, Section 8 of the United States Constitution and Section 1-206.01 of the Home Rule Act, and enacted the School Reform Act.

83.     Because the legislative enactments and administrative actions taken by the Defendants and described herein conflict with and effectively amend the School Reform Act to allow the D.C. Government to fund operating expenses for DCPS without applying a uniform

funding formula or otherwise providing equivalent funding, on a per-student basis, to D.C.

Charter Schools, they exceed Defendants' authority under the Home Rule Act and violate Article

I, § 8 of the Constitution.

84.     The following D.C. laws and actions directly conflict with and effectively amend

the School Reform Act's uniform funding requirement and, therefore, exceed Defendants'

authority under the Home Rule Act and violate Article I, § 8 of the Constitution:

  a.   ***Enrollment Calculations***: D.C. Code §§ 38-2906(a) and 38-2906.02,

       which require that D.C. Charter Schools' operating expense funding be

       based on actual, audited student enrollment, while allowing DCPS to rely

       on projected enrollment numbers, unlawfully amend and conflict with the

       School Reform Act to the extent that Defendants use those provisions to

       fund operating expenses for DCPS without providing uniform per-student

       funding to D.C. Charter Schools.

  b.   ***Supplemental Funding***: The District's Supplemental Appropriation Act

       of 2008, Revised Budget Request Act of 2012, Reprogrammings pursuant

       to D.C. Code § 38-2901(b) and D.C. Code §§ 47-361, *et. seq.*, and direct

       payments of DCPS's debts to cover operating expenses unlawfully amend

       and conflict with the School Reform Act because they purport to allow

       Defendants to fund operating expenses for DCPS outside a uniform

       funding formula without providing uniform per-student funding to D.C.

       Charter Schools.

  c.   ***Annual Budget Funding***: D.C. Code § 38-2902(b) of the UPSFF, which

       states that the uniform funding formula does not apply to "funds

       appropriated to other agencies and funds of the District government," and

the D.C. Budget Acts for 2008 through 2015 unlawfully amend and conflict with the School Reform Act to the extent that Defendants use those provisions to provide operating expenses for DCPS outside a uniform funding formula without providing uniform per-student funding to D.C. Charter Schools.

d.   ***Subsidized Services***: D.C. Code § 38-2902(b) unlawfully amends the School Reform Act to the extent that Defendants use it to fund operating expenses for DCPS outside a uniform funding formula without providing uniform per-student funding to D.C. Charter Schools.

## COUNT II

**(Violation of the Supremacy Clause of the United States Constitution)**

85.   Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 78 as though fully set forth herein.

86.   The School Reform Act of 1995 was enacted by Congress pursuant to its authority under Article I, Section 8 of the United States Constitution and Section 1-206.01 of the Home Rule Act to act as the exclusive legislature for the District of Columbia.

87.   Under the Supremacy Clause of the Constitution, federal law is the "supreme Law of the Land." U.S. Const. art. VI, § 8, cl. 2. Accordingly, laws that stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress are unlawful and preempted.

88.   Section 38-1804.01 of the School Reform Act requires the D.C. Government to fund all operating expenses for DCPS and D.C. Charter Schools from the D.C. general fund pursuant to a uniform per-student funding formula.

89.     The following D.C. laws and actions directly conflict with and stand as obstacles to the accomplishment of the full purposes and objectives of the School Reform Act's uniform funding requirement and, therefore, are unlawful and preempted:

  a.     ***Enrollment Calculations***: D.C. Code §§ 38-2906(a) and 38-2906.02, which require that D.C. Charter Schools' operating expense funding be based on actual, audited student enrollment, while allowing DCPS to rely on projected enrollment numbers, directly conflict with and are preempted by § 38-1804.01(a) and (b) of the School Reform Act to the extent that Defendants use those provisions to fund operating expenses for DCPS without providing uniform per-student funding to D.C. Charter Schools.

  b.     ***Supplemental Funding***: The District's Supplemental Appropriation Act of 2008, Revised Budget Request Act of 2012, Reprogrammings pursuant to D.C. Code § 38-2901(b) and D.C. Code §§ 47-361, *et. seq.*, and direct payments of DCPS's debts to cover operating expenses directly conflict with and are preempted by § 38-1804.01(a) and (b) of the School Reform Act because they purport to allow Defendants to fund operating expenses for DCPS outside a uniform funding formula without providing uniform per-student funding to D.C. Charter Schools.

  c.     ***Annual Budget Funding***: D.C. Code § 38-2902(b) of the UPSFF, which states that the uniform funding formula does not apply to "funds appropriated to other agencies and funds of the District government," and the D.C. Budget Acts for 2008 through 2015 directly conflict with and are preempted by § 38-1804.01(a) and (b) of the School Reform Act to the extent that Defendants use those provisions to fund operating expenses for

DCPS outside a uniform funding formula without providing uniform per-student funding to D.C. Charter Schools.

d.   ***Subsidized Services***: D.C. Code § 38-2902(b) directly conflicts with and is preempted by § 38-1804.01(a) and (b) of the School Reform Act to the extent that Defendants use it to fund operating expenses for DCPS outside a uniform funding formula without providing uniform per-student funding for D.C. Charter Schools.

## COUNT III

### (Violation of the School Reform Act of 1995)

90.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 78 as though fully set forth herein.

91.    The School Reform Act requires Defendants to fund all operating expenses for DCPS and D.C. Charter Schools based on actual student enrollment and pursuant to a uniform funding formula that provides similarly situated students with equal funding for their educations.

92.    Defendants have violated the School Reform Act's uniform funding requirements in the following ways:

a.   ***Enrollment Calculations***: Defendants have based and continue to base D.C. Charter Schools' annual operating expense funding on actual, audited student enrollment, while funding  DCPS's annual operating expenses based on projected student enrollment, ¶¶ 30-37;

b.   ***Supplemental Funding***: Defendants have funded and continue to fund DCPS operating expenses through Supplemental Funding outside a uniform per-student funding formula, including, but not limited to, Supplemental Appropriations, Reprogrammings, and Debt Payments,

without providing uniform per-student funding to D.C. Charter Schools, ¶¶ 38-48;

c.   ***Annual Budget Funding***: Defendants have funded and continue to fund DCPS operating expenses through Annual Budget Funding, including, but not limited to, through Intra-District Transfers, Line Items, and Pension Payments, without providing uniform per-student funding to D.C. Charter Schools, ¶¶ 49-58;

d.   ***Subsidized Services***: Defendants have funded and continue to fund DCPS operating expenses through subsidies provided by other D.C. agencies without providing uniform per-student funding to D.C. Charter Schools, ¶¶ 59-62;

e.   The result of each of the above violations of the School Reform Act is that Defendants have deprived children who attend D.C. Charter Schools of their right to receive the same public funding for their education as their counterparts who attend DCPS.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against all Defendants and respectfully request the following relief:

93.   A declaration that § 38-1804.01(b) of the School Reform Act requires Defendants to fund all operating expenses for DCPS and D.C. Charter Schools from the District's general fund pursuant to a uniform per-student funding formula, and therefore that the School Reform Act:

a.   with respect to ***Enrollment Calculations***, (i) preempts D.C. Code §§ 38-2906(a) and 38-2906.02 to the extent that Defendants use those provisions

to require that funding for D.C. Charter Schools be based on actual,
audited student enrollment while funding DCPS's annual operating
expenses based on projected student enrollment, and (ii) prohibits
Defendants from enacting a funding formula that uses different
methodologies for determining the student enrollment of DCPS and D.C.
Charter Schools in a manner that results in unequal funding, on a per
student basis, of D.C. Charter Schools relative to DCPS;

b.      with respect to ***Supplemental Funding***, (i) preempts the District's
Supplemental Appropriation Act of 2008, the Revised Budget Request Act
of 2012, D.C. Code § 38-2902(b), and the District's reprogramming
statute, D.C. Code § 47-361, *et. seq*., to the extent they allow Defendants
to fund DCPS operating expenses through Supplemental Funding to DCPS
without providing uniform per-student funding to D.C. Charter Schools,
and (ii) prohibits Defendants from funding DCPS operating expenses
through Supplemental Funding without providing uniform per-student
funding to D.C. Charter Schools;

c.      with respect to ***Annual Budget Funding***, (i) preempts D.C. Code § 38-
2902(b) and D.C. Budget Acts for 2008 through 2015 to the extent that
Defendants use those provisions to fund DCPS operating expenses
through Annual Budget Funding, including, but not limited to, Intra-
District Transfers, Line Items, and Pension Payments, without providing
uniform per-student funding to D.C. Charter Schools, and (ii) prohibits the
Defendants from excepting certain types of budget allocations from the
School Reform Act's uniform funding requirement or otherwise creating

unequal, per-student funding by allocating amounts from the general fund to other District agencies and then allowing those funds to be used to pay for DCPS operating expenses;

d.      with respect to *Subsidized Services*, preempts and prohibits Defendants from funding DCPS operating expenses through the provision of subsidized services without providing uniform per-student funding to D.C. Charter Schools; and

e.      with respect to *Debt Payments*, preempts and prohibits Defendants from funding DCPS operating expenses by making direct payments for DCPS debts without providing uniform per-student funding to D.C. Charter Schools.

94.     A declaration that the D.C. Council has no authority to enact legislation that amends or is inconsistent with the School Reform Act's uniform funding requirement;

95.     A permanent injunction requiring Defendants to fund all operating expenses for DCPS and D.C. Charter Schools from the District's general fund on an equivalent, per-student basis, and therefore:

a.      *Enrollment Calculations*: prohibiting Defendants from using different methodologies for calculating public school enrollment in a manner that results in the unequal funding, on a per-student basis, of D.C. Charter Schools relative to DCPS;

b.      *Supplemental Funding*: prohibiting Defendants from funding DCPS operating expenses through Supplemental Funding, including, but not limited to, Supplemental Appropriations, Reprogrammings, and Debt

Payments to DCPS without providing uniform per-student funding to D.C.

Charter Schools;

c.    ***Annual Budget Funding***: prohibiting Defendants from funding DCPS

operating expenses through Annual Budget Funding, including, but not

limited to, Intra-District Transfers, Line Items, and Pension Payments, to

DCPS without providing uniform per-student funding to D.C. Charter

Schools; and

d.    ***Subsidized Services***: prohibiting Defendants from funding DCPS

operating expenses through provision of subsidies to DCPS without

providing uniform per-student funding to D.C. Charter Schools.

96.    Such costs and reasonable attorneys' fees, including under 42 U.S.C. § 1988, to

which they may be entitled by law; and

97.    Such other relief as this Court may deem just and appropriate.


Dated:  July 30, 2014.                                    Respectfully submitted,



/s/                                                      /s/
Stephen H. Marcus (D.C. Bar # 394419)          Carl J. Nichols (D.C. Bar # 466889)
Sherry A. Ingram (D.C. Bar # 457179)           Ryan J. Huschka (D.C. Bar # 986020)
Erica J. Mueller (D.C. Bar # 490408)           Stephen V. Carey (D.C. Bar # 1004114)
The Marcus Firm, PLLC                          Alyssa DaCunha (D.C. Bar # 1003687)
1730 Rhode Island Avenue, N.W.                 Wilmer Cutler Pickering Hale and Dorr LLP
Suite 713                                      1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20036                        Washington, D.C.  20006
Tel:  202-776-0390                             Tel:  202-663-6000
Fax: 202-776-0394                              Fax: 202-663-6363

*Counsel for Plaintiffs*                       *Counsel for Plaintiffs*