## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| D.C. ASSOCIATION OF CHARTERED PUBLIC SCHOOLS, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 14-cv-1293 (TSC) |
| DISTRICT OF COLUMBIA, et al., | ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Plaintiffs bring this action challenging the District of Columbia's alleged inequitable funding of Washington, D.C. public charter schools as compared to traditional D.C. public schools ("DCPS"). Plaintiffs argue that the District is required by the School Reform Act to fund all D.C. public schools – charter schools and DCPS alike – according to a formula based on the operating costs of the schools multiplied by the number of students at each charter school and in DCPS as a whole. Plaintiffs allege that the District has violated the School Reform Act by routinely funneling money for certain expenses to DCPS outside of the statutory formula, thereby depriving charter schools of money they would normally receive if these expenses were included in the formula calculation. Plaintiffs bring three claims: violation of Article I, Section 8 of the United States Constitution and the Home Rule Act (Count I); violation of the Supremacy Clause of the United States Constitution (Count II); and violation of the School Reform Act (Count III).

Defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted. Defendants argue that where Congress passes a law which applies exclusively to the

District, as both parties agree the School Reform Act does, that law enjoys no superiority over enactments of the D.C. Council (the "Council") such as the school funding actions being challenged here. Therefore, according to Defendants, the District cannot have violated the Home Rule Act or the School Reform Act because the Council is permitted to amend or repeal the School Reform Act. Defendants also argue that the School Reform Act is not the supreme law of the land because Congress, in passing the School Reform Act, was acting as a local legislature for the District, and therefore Plaintiffs cannot bring a Supremacy Clause claim.

Because it is not yet clear whether the actions of the Council impermissibly conflict with the will of Congress as set forth in the Home Rule Act and School Reform Act, Defendants' motion to dismiss Counts I and III is denied. However, because the court finds that the Supremacy Clause does not apply to Acts of Congress passed pursuant to Article I, Section 8, Clause 17 of the Constitution, and which operate exclusively within the District, Defendants' motion to dismiss Count II is granted.

## I.   BACKGROUND

In 1996, Congress embedded within its yearly appropriation bill the District of Columbia School Reform Act of 1995 (the "School Reform Act"), Pub. L. No. 104–134, § 2002, 110 Stat. 1321 (1996) (codified as amended at D.C. Code § 38–1800.02 *et seq.*), overhauling the District's educational system. As the Senate Report to the bill explained, "[d]espite the best efforts of the Board of Education and the dedication of the superintendent, the D.C. Public Education System is broken." S. Rep. No. 104-144, at 6 (1995). The School Reform Act attempted to address this broken system in myriad ways, including by creating commissions to study and implement reforms, instructing various stakeholders to create a master plan for moving forward, and setting out a funding mechanism to address dilapidated facilities. Importantly for this case, the School

Reform Act also established public charter schools in the District. "Unlike traditional public schools, charter schools operate under charters or contracts with school districts, State education agencies, or other public institutions. They are designed by groups of parents, teachers, school administrators, other members of the community, and private corporations and are held accountable for student performance under the terms of their contracts. Also, charter schools operate with considerable autonomy from external controls such as district, State, and union requirements." *Id.* at 7.

Congress designed a formula in the School Reform Act to fund both DCPS and charter schools. As the House Report explained, "[t]his uniform formula will be used to provide operating budgets on the basis of enrollment for the school system as a whole and for individual public charter schools. According to [a] January 1995 report by [the D.C. Committee on Public Education], '[o]f the 40 largest school systems in the country, the District ranked first in per pupil expenditures.' In the context of low student academic achievement, this information is disturbing and as a result the District of Columbia is directed to establish a uniform and efficient formula for funding public education. The same formula will be used for students enrolled in individual public charter schools authorized in subtitle B of this agreement and the District of Columbia Public School System . . . Such a formula will clarify and focus decisions regarding funding for public education around students' needs." H.R. Rep. No. 104-455, at 146 (1996), http://www.gpo.gov/fdsys/pkg/CRPT-104hrpt455/pdf/CRPT-104hrpt455.pdf (citation omitted). The formula involves multiplying a uniform dollar amount reflective of school operating expenses (as calculated by the Mayor and the D.C. Council in consultation with the Board of Education and the Superintendent) by the number of students in DCPS and each individual charter school. D.C. Code § 38-1804.01(b).

Plaintiffs are two charter schools located in the District and an association that represents 39 District charter schools. The crux of this case is Plaintiffs' allegation that the District has creatively circumvented the funding formula in order to supplement DCPS's budget, to the detriment of charter schools. Plaintiffs identify four broad categories where they allege the District is violating the School Reform Act's uniform funding formula provision:

**Enrollment Calculations**: Defendants fail to provide D.C. Charter Schools with uniform per-student funding when they fund D.C. Charter Schools based on actual, audited student enrollment, and reduce funding to D.C. Charter Schools if actual enrollment is lower than projected, while funding DCPS based on projected, and often inflated, student enrollment . . . ;

**Supplemental Funding**: Defendants fail to provide D.C. Charter Schools with uniform per-student funding when they fund certain DCPS operating expenses by providing supplemental funding outside the uniform per-student funding formula without accounting for such funding in calculating the per-student payments made to D.C. Charter Schools for their operating expenses. Supplemental Funding includes, but is not limited to, enacting legislation to provide supplemental appropriations to DCPS but not to D.C. Charter Schools . . . reprogramming and transferring to DCPS funds previously appropriated to other D.C. government agencies . . . and paying DCPS's debts directly . . . ;

**Annual Budget Funding**: Defendants fail to provide D.C. Charter Schools with uniform per-student funding when they fund certain DCPS operating expenses through the District's annual budget process without accounting for such funding in calculating the per-student payments made to D.C. Charter Schools for their operating expenses. Annual Budget Funding includes, but is not limited to, intra-district transfers of funds from other D.C. agencies to DCPS . . . line items in the District's annual budget that are allocated to other D.C. government agencies for services those agencies provide to DCPS without charge . . . and funding DCPS pension fund payments . . . ; and

**Subsidized Services**: Defendants fail to provide D.C. Charter Schools with uniform per-student funding when they fund certain DCPS operating expenses through subsidies of services provided to DCPS and do not account for those subsidies in calculating the per-student payments made to D.C. Charter Schools for their operating expenses.

(Compl. ¶ 5). Plaintiffs seek a declaration that these actions violate the School Reform Act and an injunction requiring the District to uniformly fund DCPS and charter schools pursuant to the funding formula provision of the School Reform Act.

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). Although a plaintiff may survive a Rule 12(b)(6) motion even where "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 56 (2007) (internal quotation marks and citation omitted). Moreover, a pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## III.   ANALYSIS

### a.   The District Clause and the Home Rule Act

The District of Columbia is "an exceptional community . . . established under the Constitution as the seat of the National Government." *District of Columbia v. Murphy,* 314 U.S. 441, 452 (1941). Article I, Section 8, Clause 17 of the United States Constitution grants Congress plenary authority over the District. *See* U.S. Const. art. I, § 8, cl. 17 ("The Congress shall have the power . . . [t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States . . .") (the

"District Clause"). For most of its history, Congress exercised this legislative authority and governed the District directly.[1] In 1973, Congress delegated its legislative authority to the D.C. Council in the District of Columbia Self–Government and Governmental Reorganization Act, Pub. L. No. 93–198, 87 Stat. 774 (1973) (the "Home Rule Act"). As Congress explained in the Statement of Purposes to the Home Rule Act:

> Subject to the retention by Congress of the ultimate legislative authority over the Nation's Capital granted by article I, section 8, of the Constitution, the intent of Congress is to delegate certain legislative powers to the government of the District of Columbia; authorize the election of certain local officials by the registered qualified electors in the District of Columbia; grant to the inhabitants of the District of Columbia powers of local self-government; to modernize, reorganize, and otherwise improve the governmental structure of the District of Columbia; and, to the greatest extent possible, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters.

*Id.* at § 102.

Count I of Plaintiffs' Complaint turns on the tension between Congress relieving itself of the "burden of legislating upon essentially local District matters," and its retention of "ultimate legislative authority" over the District pursuant to the District Clause. *Id.* The parties vigorously dispute the interplay between the District Clause and the Home Rule Act, and differ significantly in their respective interpretations of the relationship between Congress and the D.C. Council with respect to local legislation.

Defendants argue that under the Home Rule Act, the Council has the authority to amend or repeal any Act of Congress that applies exclusively to the District unless the Home Rule Act specifically forbids it. This is in some contrast to Defendants' position at oral argument, where Defendants appeared to retreat from that position and chose not to opine on the Council's

---

[1] For a thorough overview of the history of the District's creation and governance, *see generally Adams v. Clinton*, 90 F. Supp. 2d. 35 (D.D.C. 2000).

broader authority, instead arguing only that the School Reform Act does not limit the Council's authority to fund schools in the manner challenged here.

Plaintiffs argue that once Congress legislates for the District, the Council is powerless to amend or contradict Congress' will absent specific congressional authorization. Therefore, since Congress passed the School Reform Act and required the District to use the uniform funding formula, and because Congress has not specifically delegated to the Council the authority to amend or repeal the School Reform Act, the District's actions ignoring or conflicting with the formula are unlawful.

The parties' arguments can be stated as two sides of the same coin: Defendants argue that the Council is permitted to take any action that is not specifically prohibited, while Plaintiffs argue that the Council is prohibited from taking any action that is not specifically permitted. The issue for this court to decide, therefore, is the extent of the Council's authority once Congress has passed a law that applies exclusively to the District.

      *i.   The Case Law*

Defendants cite a handful of cases in which courts have held that the Council has the power to amend or repeal Acts of Congress that apply exclusively to the District. If the Council has such authority, Defendants argue, then the District cannot have violated the Home Rule Act or the School Reform Act when it passed laws related to school funding, because the Council can amend or repeal the School Reform Act as it pleases. For example, in *District of Columbia v. Greater Washington Central Labor Council, AFL-CIO*, 442 A.2d 110, 115 (D.C. 1982), the D.C. Court of Appeals held that the Council did not contravene the Home Rule Act when it passed a worker's compensation law in 1980 that repealed a preexisting congressional enactment originally passed in 1928. The D.C. Court of Appeals affirmed this understanding in *McConnell*

*v. United States*, 537 A.2d 211 (D.C. 1988), explaining that in *Greater Washington*, "we made clear that, although the Council, under § 1–233(a)(3), may repeal a congressionally-enacted statute limited in application to the District of Columbia, the Council may not repeal a federal statute of broader application." *Id.* at 215 (holding that because Council-enacted legislation conflicted with nationally-applicable federal legislation, the Council had no authority to repeal the federal law); *see also Brizill v. D.C. Bd. of Elections & Ethics*, 911 A.2d 1212, 1216 (D.C. 2006) ("Because section 1175 does not apply exclusively to the District, neither the Council nor the voters through initiative may amend or repeal this Congressional prohibition on using and possessing gambling devices within the District of Columbia.").

Defendants also cite federal cases concurring with the United States Court of Appeals for the District of Columbia Circuit's interpretation of the Council's authority to repeal Acts of Congress. In a case (similar to *Greater Washington*) regarding the relationship between federal and D.C. worker's compensation laws, the D.C. Circuit agreed with the D.C. Court of Appeals that the Council had repealed a Congressional enactment "in a valid exercise of its powers under the [Home Rule Act], and as to which Congress declined to exercise its reserved right of veto." *Keener v. Washington Metro. Area Transit Auth.*, 800 F.2d 1173, 1179 (D.C. Cir. 1986). In addition, at least one court in this district (in denying a motion for a temporary restraining order and preliminary injunction) has held, relying in part on *McConnell*, that

> [t]he Home Rule Act—a statute duly enacted by Congress—in fact authorizes the Council to repeal statutes previously enacted by Congress restricted in their application exclusively to or in the District of Columbia. . . . The Transportation Infrastructure Emergency Amendment Act of 2010 implicitly repealed a statute applicable only to the District of Columbia. The act was . . . transmitted to both houses of Congress for review. Congress did not object to the act, and it went into effect[.] . . . Congress retains the authority to repeal the 2010 Act in the future, but at this time the 2010 Act effectively repealed the 1888 prohibition.

*Kingman Park Civic Ass'n v. Gray*, 956 F. Supp. 2d 230, 246 (D.D.C. 2013).  Defendants argue

that application of these cases here mandates dismissal of Count I because the cases establish

that the Council has the authority to amend or repeal the School Reform Act, including the

funding formula.

Plaintiffs disagree, relying on a key distinction between the cases cited by Defendants

and the facts here. This distinction arises out of Section 717(b) of the Home Rule Act, which

states that

> [n]o law or regulation which is in force on [January 2, 1975] shall be deemed
> amended or repealed by this act except to the extent specifically provided herein or
> to the extent that such law or regulation is inconsistent with this act, but any such
> law or regulation may be amended or repealed by act or resolution as authorized in
> this chapter, or by Act of Congress.

Pub. L. No. 93-198, 87 Stat. 774, § 717(b) (1973); *see also* D.C. Code §§ 1-207.17(b),

1-207.61(b).[2]  Plaintiffs argue that all of the cases relied on by Defendants involve the Council's

repeal of Congressional enactments passed *before* 1975, meaning that the Home Rule Act

specifically authorized the Council to effect such repeals. By contrast, the School Reform Act

was enacted *after* January 2, 1975, meaning that Section 717(b) does not give the Council the

authority to repeal the Act. Defendants have cited no case where a court has upheld the D.C.

Council's amendment or repeal of an Act of Congress passed *after* January 2, 1975.

While Plaintiffs accurately note that all the Acts of Congress involved in *Greater*

*Washington*, *Kingman*, etc. predated home rule, Plaintiffs fail to recognize that the courts in

those cases did not cite or rely on Section 717(b) in their respective analyses. Instead, those

courts relied on an entirely different provision of the Home Rule Act to find that the Council had

---

[2] It is not apparent on the face of the Home Rule Act why this provision is repeated in two
sections of the Act.

the authority to repeal the Congressional enactments at issue. Specifically, the courts reasoned that, because Congress in the Home Rule Act explicitly provided that "[t]he Council shall have no authority to . . . [e]nact any act, or enact any act to amend or repeal any Act of Congress . . . which is not restricted in its application exclusively in or to the District," D.C. Code § 1-206.02, by implication the Council *did* have the authority to amend or repeal Acts of Congress which were restricted in their application exclusively in or to the District. Section 717(b), and the fact that the Acts of Congress at issue predated home rule, simply did not enter the analytical framework in those cases.

The fact that the Acts of Congress repealed in *Greater Washington* and *Kingman* were enacted before 1975 makes a difference, but not because of Section 717(b), which neither of those courts discussed or identified. The salient difference between the facts there and the facts here is that in those cases, there was no need to analyze Congressional intent regarding the D.C. Council's delegated authority. Before 1975, the D.C. Council (as a semi-independent, popularly elected legislative body) did not exist. Therefore, save for brief periods of time from 1871 to 1874 and from 1967 to 1973 in which the District had its own local legislature or presidentially appointed council, whenever Congress passed legislation before 1975, it would not have considered whether it intended to withdraw delegated authority from the local District legislature on a particular issue, because no local legislature would have existed.[3] Because there was no

---

[3] "[F]or most of its history, the District of Columbia has had nothing that could even roughly be characterized as a legislature for the entire District." *Adams*, 90 F. Supp. 2d at 47. Notably, however, "Congress established a territorial form of government for the District" in 1871. *Id.* at 47 n.19 (citing An Act to Provide a Government for the District of Columbia, 16 Stat. 419, ch. 62 (1871)); *see also Metro. R. Co. v. District of Columbia*, 132 U.S. 1, 7 (1889) ("In 1871 an important modification was made in the form of the District government. A legislature was established, with all the apparatus of a distinct government."). In 1874, this government, including the local legislature, was abolished and "replaced by a commission system." *Adams*, 90 F. Supp. 2d at 47 n.19 (citing An Act for the Government of the District of Columbia, and for

other body which shared legislative authority with Congress for most of the District's history, there would have been no reason for Congress to contemplate whether it intended to have the "final word"—its word was final by default. For example, the 1928 Congress that passed the worker's compensation law at issue in *Greater Washington* would not have considered whether it intended for the local legislature to have the ability to repeal that law, because only Congress exercised legislative authority at that time, as "the District's governing body was a three-person commission appointed by the President," *Adams*, 90 F.Supp.2d at 47 n.19, without "[l]egislative powers" and "confined to mere administration." *Metro. R. Co.*, 132 U.S. at 21, 22. By contrast, after 1975 Congress would have been aware that it had granted legislative authority to the D.C. Council, and would likely have considered what role the Council should play going forward in any area in which Congress chose to legislate.

Thus, while the cases cited by Defendants no doubt suggest that the Council has broad authority, ultimately those courts did not wrestle with the precise facts at issue here—post-Home

---

Other Purposes, 18 Stat. 116, ch. 337 (1874)); *see also Metro. R. Co.*, 132 U.S. at 6-7 (noting that the local government established in 1871 "lasted until June 20, 1874, when an act was passed" by which "the government established by the act of 1871 was abolished"). The commission system established in 1874 was "modified in 1878" so that "the District's governing body [became] a three-person commission appointed by the President." *Adams*, 90 F. Supp. 2d at 47 n.19 (citing An Act Providing a Permanent Form of Government for the District of Columbia, 20 Stat. 102, ch. 180 (1878)). This new commission, like the one established in 1874, was without legislative power. *See Metro. R. Co.*, 132 U.S. at 21-22 (noting that, with the 1874 and 1878 Acts, "[l]egislative powers [had] ceased, and the municipal government [became] confined to mere administration"). "The commission system was replaced in 1967 by a mayor-commissioner and council form of government, the members of which were appointed by the President," thereby returning some semblance of a local legislature to the District for the first time since the early 1870s. *Adams*, 90 F. Supp. 2d at 47 n.19 (citing Reorganization Plan No. 3 of 1967, Pub. L. No. 90–623, 81 Stat. 948 (1967)). This form of government lasted until 1973, when the Home Rule Act "creat[ed] a mayor" and replaced the presidentially appointed council with a "council elected by the citizens of the District, . . . granting them certain executive and legislative authority" while "reserv[ing] ultimate authority over District governance to Congress." *Id.* (citing the Home Rule Act).

11

Rule Act legislation—and given the impact of the Home Rule Act on the governance of the District and the role of Congress, that difference renders those cases persuasive, but not dispositive.

### ii.  *Statutory Interpretation*

Defendants also argue (at least in their briefing) that certain provisions of the Home Rule Act make clear that the Council has the authority to repeal Acts of Congress that apply exclusively to the District.  Section 302 of the Home Rule act provides that, subject to certain exceptions, "the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this chapter."  D.C. Code § 1-203.02.  Section 404(a) vests this power in the D.C. Council.  *Id.* at § 1-204.04(a).  The Council is therefore delegated all legislative power within the District unless specifically limited.  Section 602(a)(3) of the Home Rule Act, the provision relied on in *Greater Washington* and *Kingman*, is such a specific limitation—it prohibits the Council from amending or repealing any law not exclusive to the District.  *Id.* at § 1-206.02(a)(3).  This exception, according to Defendants, proves the rule: because the Council is given all the legislative power within the District, and that power extends to all subjects unless specifically limited, when Congress specifically limited the Council's power with respect to laws applicable outside the District, the legislative power remained for laws applicable only inside the District.

Defendants also contend that Congress can, and has, specifically limited the Council's authority to amend or repeal Acts of Congress, meaning that their failure to do so in the School Reform Act is indicative of their intent not to limit the Council here.  For example, in 1995 Congress passed the District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. No. 104–8, 109 Stat. 97, 98 (1995) (the "FRMAA"), which, among other

things created what is colloquially known as the Control Board, which was authorized to take over a number of financial and other duties from local D.C. government agencies.  Congress amended the Home Rule Act to add to the "Limitations on the Council" in Section 602, and specifically prohibited the Council from "[e]nact[ing] any act, resolution, or rule with respect to the District of Columbia Financial Responsibility and Management Assistance Authority established under § 47-391.01(a)."  D.C. Code § 1-206.02(a)(10).  According to Defendants, because a similar limitation was not added to the School Reform Act, this indicates that Congress did not intend to limit the Council here as it did in the FRMAA.

Plaintiffs take a different view.  They argue that the Home Rule Act makes clear that the Council does *not* have the authority to amend or repeal Acts of Congress.  First, Plaintiffs cite Section 717(b) of the Home Rule Act, which grants the Council the authority to amend or repeal laws or regulations in force before 1975.  Plaintiffs argue that if the Council were authorized to repeal any Act of Congress, before or after 1975, this section would be wholly unnecessary. According to Plaintiffs, the fact that the Council was authorized to repeal pre-1975 laws shows that it was not authorized to repeal post-1975 laws.

Plaintiffs also argue that Section 601 of the Home Rule Act supports their interpretation that once Congress legislates for the District, the Council loses its authority to do so in that same area.  Section 601 states that

> the Congress of the United States reserves the right, at any time, to exercise its
> constitutional authority as legislature for the District, by enacting legislation for the
> District on any subject, whether within or without the scope of legislative power
> granted to the Council by this chapter, including legislation to amend or repeal any
> law in force in the District prior to or after enactment of this chapter and any act
> passed by the Council.

D.C. Code § 1-206.01.  Plaintiffs argue that Section 601—which is explicitly referenced as a limitation on the Council's power in Sections 302 and 404(a) of the Home Rule Act (the sections

delegating legislative authority to the District and the Council, respectively)—reserves to Congress its constitutional role as legislature, meaning that when Congress chooses to legislate for the District, delegation to the Council is withdrawn.[4]

Plaintiffs cite in support of their argument the D.C. Circuit's opinion in *Shook v. D.C. Financial Responsibility & Management Assistance Authority*, 132 F.3d 775, 780 (D.C. Cir. 1998), where the Court held that the District Charter "is simply an Act of Congress which can be modified either expressly or impliedly by Congress as it wishes," and notes that Section 601 of the Home Rule Act "specifically reserves that power." While *Shook* is instructive because it makes clear that Congress can impliedly modify the District's authority, ultimately the actual holding in *Shook* is inapposite here because in that case, the modifications were explicit. *Shook* involved the authority of the Control Board vis-à-vis the Board of Education (not, as here, the authority of Congress vis-à-vis the Council), after Congress passed the FRMAA. The Court found that "the FRMAA is replete with modifications of the Charter," and relied on these explicit modifications to hold that the Control Board assumed ultimate authority over the Board of Education. *Id.* Therefore, *Shook* is of limited relevance in determining when Congress impliedly modifies the Home Rule Act to strip the Council of legislative authority.

Plaintiffs' reliance on *Marijuana Policy Project v. United States*, 304 F.3d 82 (D.C. Cir. 2002), is similarly misplaced. In that case, Congress had passed the Barr Amendment, a rider to a D.C. appropriations act which specifically mandated that "[n]one of the funds contained in this

---

[4] Plaintiffs analogize Congress' relationship with the District to Congress' relationship with territories, or to states' relationship with municipalities, citing cases like *Murphy v. Utter*, 186 U.S. 95 (1902). However, as the Supreme Court has noted, "[u]nlike either the States or Territories, the District is truly *sui generis* in our governmental structure." *District of Columbia v. Carter*, 409 U.S. 418, 432 (1973). Given the unique nature of the Home Rule Act and its interplay with the Constitution, the court finds these analogies helpful but not persuasive.

Act may be used to enact . . . any law . . . to legalize or otherwise reduce penalties associated with" marijuana. *Id.* at 84 (internal quotation marks and citation omitted). The D.C. Circuit held that because the "Amendment says only that Congress, not the D.C. Council, may reduce marijuana penalties," it "add[ed] another item to this list of matters that, in the words of the Home Rule Act, are not 'rightful subjects of legislation.'" *Id.* (citation omitted)

Unlike *Shook* or *Marijuana Policy Project*, Congress has not explicitly withdrawn the Council's authority to legislate in the School Reform Act. Neither side here alleges that Congress expressly added District public school funding to the list of exceptions to the Council's power, as was the case in *Shook*, or explicitly prohibited the Council from passing legislation in that area, as in *Marijuana Policy Project*. These cases are therefore of limited relevance in determining whether and to what extent Congress intended to limit the Council's authority in the School Reform Act.

While none of the cases cited by either side is directly on point, when taken together, they lead to the conclusion that the truth, as it so often does, lies somewhere in between. Defendants are likely mistaken in their assertion that the only way Congress can withdraw the Council's authority is to amend the Home Rule Act and add to the list of enumerated exceptions. As *Shook* and other cases make clear, Congress may impliedly—as well as expressly—withdraw the Council's delegated authority. On the other hand, Plaintiffs cannot be correct that once Congress legislates, the Council is forever excluded from legislating in that area. This conclusion would run contrary to the very purpose of the Home Rule Act, which was to unburden Congress from running the District's affairs. If it was the case that any time Congress acted with regard to the District, it necessarily withdrew the Council's legislative authority entirely, over time this would

likely eviscerate the Home Rule Act and return Congress to the unwanted position of acting as a local legislature for the District.

The question thus becomes how to tell the difference between when Congress acts in tandem with the Council, and when it has the final word. That question, like any question concerning Congress' legislation for the District, has "a central focus: the intent of Congress." *District of Columbia v. Washington Home Ownership Council, Inc.*, 415 A.2d 1349, 1351 (D.C. 1980) (en banc). The court notes that it will not decide this issue as a general proposition because Defendants apparently no longer rest their motion on the argument that the Council has the authority to repeal any Act of Congress that applies exclusively to the District. The court will instead focus on Defendants' pared-back argument: that nothing in the School Reform Act prevents the Council from amending or repealing that Act.

The text, context, and history of the School Reform Act show that while Congress did not intend on the Council treating the funding formula as optional, it is too early to determine whether the District's actions contravene Congress' intent or whether Congress has acquiesced in the District's actions.

### iii.   The Funding Formula

On its face, the text of the School Reform Act's uniform funding formula provision is clear. It provides that "[t]he Mayor and the District of Columbia Council, in consultation with the Board of Education and the Superintendent, *shall* establish . . . a formula to determine the amount of" the annual payment to DCPS and charter schools, and that the amount of this annual payment "*shall* be calculated by multiplying a uniform dollar amount used in the formula established under such paragraph by" the number of students in DCPS and each individual charter school. D.C. Code § 38-1804.01(b)(1)-(2) (emphasis added). The Supreme Court has

often stated "that when a statute uses the word 'shall,' Congress has imposed a mandatory duty upon the subject of the command." *Forest Guardians v. Babbitt,* 174 F.3d 1178, 1187 (10th Cir. 1999) (citing *United States v. Monsanto,* 491 U.S. 600, 607 (1989)) ("by using 'shall' in civil forfeiture statute, 'Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied'"); *see also Pierce v. Underwood,* 487 U.S. 552, 569–70 (1988) (Congress' use of "shall" in a housing subsidy statute constitutes "mandatory language"); *Black's Law Dictionary* 1585 (10th ed. 2014) ("Has a duty to; more broadly, is required to . . . This is the mandatory sense that drafters typically intend and that courts typically uphold."). A facial reading of the text of the School Reform Act therefore leaves little room to doubt that Congress intended for the District to use the uniform funding formula, and did not anticipate the Council amending or repealing it.

Defendants maintain that the use of the term "shall" in the School Reform Act was merely customary drafting verbiage, and that Congress (like any legislature) could not have drafted the statute any other way. However, the School Reform Act itself provides many examples of how Congress can and does draft statutes with varying levels of obligation. For example, in the subpart immediately following the formula calculation, Congress provided exceptions to the formula, explaining that "the Mayor and the District of Columbia Council, in consultation with the Board of Education and the Superintendent, *may* adjust the formula to increase or decrease the amount of the annual payment to the District of Columbia public schools or each public charter school" based on the number of students and cost of each grade level. D.C. Code § 38-1804.01(3)(A) (emphasis added). In a section regarding parent-teacher conferences, Congress stated that "the Mayor *is authorized* to develop and implement a policy encouraging" attendance at such conferences. D.C. Code § 38-1809.01 (emphasis added). In a

section creating a private, nonprofit corporation to study and institute certain educational reforms, Congress dictated that while federal support for that entity would cease in 1999, "*[i]t [was] the sense of the Congress that . . .* [t]he activities of the private, nonprofit corporation . . . should continue to be carried out after October 1, 1999, with resources made available from the private sector." D.C. Code § 38-1806.09(b) (emphasis added). Thus, Congress clearly knew how to make some sections of the School Reform Act mandatory and others not, and "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004) (internal quotation marks and citation omitted).

Once again, however, this seemingly straightforward analysis is thrown off-kilter by the *sui generis* nature of the District. Most cases analyzing Congress' use of the word "shall" involve Acts of Congress instructing administrative agencies or courts. They do not consider circumstances where the presumptively mandatory instruction is directed at another legislature, which arguably shares dual authority with Congress and may be able to amend or repeal Congressional enactments. That these unusual circumstances may alter the equation is evidenced by the numerous actions taken by the Council since the enactment of the Home Rule Act in which the Council has amended or repealed parts of or entire Acts of Congress, including provisions with mandatory "shall" language.

For example, the Council appears to have repealed or amended two sections in the School Reform Act which required federal involvement in local D.C. schools. In the original School Reform Act, Congress created a Public Charter School Board, whose members were appointed by the Mayor from a list provided by the U.S. Secretary of Education. In 2010, the D.C. Council, in a budget act not vetoed by Congress, removed the Secretary of Education's

18

involvement.  Fiscal Year 2011 Budget Support Act of 2010, 2010 District of Columbia Laws 18-223.  In the School Modernization Financing Act of 2006 (which Congress also did not veto), the Council repealed section 2551 of the School Reform Act which required the Superintendent and the Administrator of the General Services Administration to enter into a memorandum of agreement regarding school facilities management.  School Modernization Financing Act of 2006, 2006 District of Columbia Laws 16-123.

In addition to these examples from the School Reform Act itself, Defendants provided numerous examples where, after passage of the Home Rule Act, the District and Congress have gone back and forth amending various D.C. laws.  Plaintiffs correctly point out, however, that several of these examples relate to litigation where the Council's legislative power derived from a specific grant of authority to the Council in the Home Rule Act to amend, repeal or supersede Congressional legislation enacted after 1975, and that several other examples involve Acts of Congress that were enacted prior to 1975.  Plaintiffs also correctly point out that none of the examples cited by Defendants involve any court holding that the D.C. Council has the authority to amend or repeal a law enacted by Congress after 1975 absent specific authority to do so. These examples are therefore less than persuasive.

In any event, all of the foregoing suggests that the mandatory language in the funding formula may not be dispositive, given the unique legislative relationship between the District and Congress—*i.e.*, if the District can (and has) repealed Acts of Congress that used the term "shall," then that term alone cannot necessarily delineate Congress' intent with respect to the Council's authority.

Assuming that the School Reform Act itself is ambiguous (not on its terms, but because of the unusual nature of the District), the court looks to its legislative history.  *See BedRoc Ltd.,*

*LLC v. United States*, 541 U.S. 176, 186 (2004).  The School Reform Act was passed not long

after the FRMAA, under which Congress took over the District's finances and slashed its budget.

Congress described the FRMAA as "the most sweeping Federal involvement in local affairs

since Home Rule began and a reflection of members' profound doubts about the District's ability

to manage itself."  H.R. Rep. No. 104-294, at 6 (1995).  After addressing the District's finances,

Congress turned its attention to local public education.  The Senate explained in its Report that

"the D.C. Public Education System [was] broken" and "characterized by competition rather than

cooperation; by distrust, of new ideas and Congress, rather than compromise; by self-interest,

rather than the interests of the school children.  It is among the national leaders in expenditures

per student and near the bottom in results for that investment."  S. Rep. No. 104-144, at 6.  That

same Report set forth Congress' understanding of its role in D.C. public education: "Needed

changes in the D.C. Public School System will not be imposed from the Congress.  Those

changes must come from the local community, with every part, including the Congress, pitching

in.  What the Congress can do, and has a responsibility to do, is to create a structure within which

change and reform will take place.  The accompanying bill includes three provisions which

attempt to create that structure."  *Id.*

One of those three provisions was the creation of public charter schools.  According to

the Senate Report, "[c]harter schools offer great promise in reforming public education because

they link the important factors of school-site autonomy, parental choice, regulatory flexibility,

private sector initiative, accountability for student outcomes, and community participation."  *Id.*

at 7.  The House Report echoed this same support, and explained that

> [a]ccording to [a] January 1995 report by [the D.C. Committee on Public
> Education], "[o]f the 40 largest school systems in the country, the District ranked
> first in per pupil expenditures."  In the context of low student academic
> achievement, this information is disturbing and as a result the District of Columbia

is directed to establish a uniform and efficient formula for funding public education. The same formula will be used for students enrolled in individual public charter schools authorized in subtitle B of this agreement and the District of Columbia Public School System. The formula may take into account such variations as students at different grade levels and students with special needs. Such a formula will clarify and focus decisions regarding funding for public education around students' needs.

H.R. Rep. No.104-455 at 146.

The year after the School Reform Act was passed, Congress further commented on the funding formula. In its Report to the 1997 D.C. appropriations bill, the House explained that

Section 2401 of the [School Reform Act], *mandated* in relevant part that "the Mayor and the District of Columbia Council, in consultation with the Board of Education and the Superintendent, shall establish not later than 90 days after the enactment of this Act, a formula to determine" . . . the annual payment . . . "(f)or fiscal year 1997 and for each subsequent year" . . . for public schools under the control of the Board of Education and for each public charter school, with such annual payments to be . . . "calculated by multiplying a uniform dollar amount . . . by the number of students" in specified grade levels. [The School Reform Act] became effective on April 26, 1996, and thus the uniform per student funding formula *had to be established* by the Mayor and Council by no later than July 25, 1996. After a series of meetings involving members of the Board of Education, Board staff, school system officials and representatives of the Superintendent of Schools, Council Committee on Education and Libraries staff, representatives of the Mayor, staff of the Control Board, and community representatives, agreement was reached on a weighted funding formula. . . . The Committee notes that for Fiscal Year 1998 and subsequent years, the funding formula and annual payments derived from per pupil allocations to both public charter schools and public schools under the control of the Board of Education *must include* the total costs of the operations of the Board of Education itself, all central administration and central office costs, including those applicable to the Superintendent of Schools, all facilities operating costs, including utilities, all local education agency evaluation, assessment, and monitoring costs, and any other direct or indirect costs normally incurred by, or allocated to, schools under the control of the Board of Education and the overall public school system.

H.R. Rep. No. 104-689, at 49 (emphasis added).

This legislative history suggests that Congress did not consider charter schools, or the formula to fund them, optional. Rather, Congress stepped into what it considered a dire situation, and set up structures to try to solve the District's public education crisis. One of these

21

structures was charter schools, and the mechanism to fund them was the uniform formula.  On the other hand, Congress' overall intention was for its role in D.C. public education to be limited. As Congress made clear both in the text of the School Reform Act (which directs virtually all actions to be taken by local District officials) and in its legislative history, "[n]eeded changes in the D.C. Public School System will not be imposed from the Congress."  S. Rep. No. 104-144, at 6.  Congress thus did not intend to take over the D.C. public school system or withdraw the authority of local officials to run that system.  Instead, the legislative history indicates that Congress stepped in to set up the foundation of a system which it hoped the District could then build upon to improve outcomes in local public education.  It clearly did not intend on taking over local education in the District; otherwise, it would not have put local officials in charge.  It did, however, intend on those officials building on the structures it created, not discarding them.

The question remains whether the actions taken by the Council at issue in this case built on those structures, or undermined them.  It may be that Congress left the Council with the discretion to take actions in addition to or outside of the funding formula, meaning that the District did not violate the Home Rule Act or Congress' constitutional prerogative over the District.  It appears that some (if not all) of the challenged Council actions were at least passively approved by Congress, although it is unclear exactly how much information Congress was provided during the Congressional review period for those actions.  It may also be that Congress did not intend on the Council funding DCPS in certain ways, meaning the challenged actions impermissibly conflict with the School Reform Act's implied withdrawal of the Council's delegated authority.  Those lines are not yet drawn, and the court will not speculate on what exactly the School Reform Act (through its implied effect on the Home Rule Act) does or does not allow in a vacuum.  As it stands, the uniform funding formula is on the books, and it is not

clear whether it has been violated, whether it has been amended or repealed by Council enactments (through Congressional acquiescence or otherwise), or whether the challenged actions do not implicate or conflict with the funding formula at all. At this stage of the proceedings, it is enough to find that Plaintiffs have alleged facts which, if true, raise their right to relief above the level of mere speculation. Defendants' motion to dismiss Count I is therefore denied.

      b. <u>Supremacy Clause</u>

      The Supremacy Clause to the United States Constitution states that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Defendants' motion to dismiss Count II turns on a deceptively simple question: whether the Supremacy Clause applies to Acts of Congress that apply only within the District of Columbia. Both sides marshal cases that come close to answering the question, but are ultimately distinguishable on one ground or another. However, after careful review, this court concludes that the Supremacy Clause does not apply in these circumstances.

      As a threshold matter, the parties do not appear to dispute that the School Reform Act is an Act of Congress that applies only within the District. As the court in *McKinney-Byrd Acad. Pub. Charter Sch. v. District of Columbia* explained, "on its face, the School Reform Act makes clear that it is applicable only to the District of Columbia and is tailored to address the specific needs of the District of Columbia." *McKinney-Byrd Acad. Pub. Charter Sch. v. D.C.*, No. 4-02230, 2005 WL 1902873, at *2-3 (D.D.C. July 21, 2005), *case dismissed sub nom. McKinney-*

*Byrd Acad. Pub. Charter Sch. v. Gov't of District of Columbia*, No. 05-7115, 2005 WL 3789050 (D.C. Cir. Oct. 31, 2005). This court agrees with the analysis in *McKinney-Byrd* and finds that the School Reform Act applies exclusively within the District.

Assuming the local nature of the School Reform Act, Defendants argue that the Supremacy Clause claim is an open-and-shut issue based on the D.C. Circuit's holding in *Dist. Properties Assocs. v. District of Columbia*, 743 F.2d 21 (D.C. Cir. 1984). In that case, the D.C. Circuit analyzed whether the District of Columbia Administrative Procedure Act ("DC APA"), enacted by Congress, precluded a federal Section 1983 claim. *Id.* at 27. The district court held that the DC APA provided an exclusive remedy and precluded a federal claim. *Id.* The D.C. Circuit, in discussing how to analyze the relationship between the DC APA and Section 1983, explained that "[w]hen Congress acts as the local legislature for the District of Columbia and enacts legislation applicable only to the District of Columbia and tailored to meet specifically local needs, its enactments should—absent evidence of contrary congressional intent—be treated as local law, interacting with federal law as would the laws of the several states." (Def.'s Mot. at 18) (citing *Dist. Properties Assocs.*, 743 F.2d at 27). Because ordinarily, a state statute which provides a remedy to a Section 1983 plaintiff does not preclude a concurrent federal claim, the Court held that the DC APA did not preclude a Section 1983 claim. *Dist. Properties Assocs.*, 743 F.2d at 27.

Defendants argue that under *District Properties Associates*, because Congress was acting as a local legislature for the District when it passed the School Reform Act, and because there is no congressional intent to the contrary, the School Reform Act should "be treated as local law, interacting with federal law as would the laws of the several states." *Id.* It follows that if the

School Reform Act is treated as local law, it is not the supreme law of the land under the Supremacy Clause, and Count II must be dismissed.

The analysis is not that simple, however. In *District Properties Associates*, the Court specifically relied on Section 1983 in its analysis. Section 1983 includes a provision that "[f]or the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia." *Dist. Properties Assocs.*, 743 F.2d at 27) (internal quotation marks and citation omitted). Thus, while Congress identified the treatment that D.C.-specific laws were to receive under Section 1983, Congress' choice of how to treat D.C.-specific laws in a particular statute is not dispositive with respect to the status of such laws under the Constitution.

The decision in *McKinney-Byrd* similarly appears at first blush to answer the question, but falls short in the same way as *District Property Associates*. In *McKinney-Byrd*, the court held that because the School Reform Act should be treated as a local law, it was not a "law[] . . . of the United States" sufficient to confer federal question jurisdiction pursuant to 28 U.S.C. § 1331. 2005 WL 1902873, at *2. Under that logic, the School Reform Act would also not be a "Law[] of the United States" under the Supremacy Clause. However, for purposes of federal question jurisdiction, Congress has determined how to treat District law, specifically explaining that "references to laws of the United States or Acts of Congress do not include laws applicable exclusively to the District of Columbia." 28 U.S.C. § 1366. Congress thus specifically carved out Acts of Congress that apply exclusively to the District from the "laws of the United States" sufficient to confer jurisdiction on the federal courts. Neither *McKinney-Byrd* nor *District*

*Property Associates* considered the Supremacy Clause at all, and their analysis of D.C. law in the context of specific statutory frameworks is of limited use here.[5]

The cases cited by Plaintiffs also do not squarely answer the question.  Plaintiffs cite cases where courts, including the D.C. Circuit, have applied the preemption doctrine to Congressional legislation applicable only within the District.[6]  Plaintiffs argue that because courts have applied the preemption doctrine to laws applicable only within the District, this shows that the Supremacy Clause applies to these laws, because the preemption doctrine arises out of the Supremacy Clause.  However, the cases Plaintiffs cite have either specifically avoided the question of whether they were invoking the Supremacy Clause, or have stated that while they applied preemption analysis, that analysis was not grounded in the Supremacy Clause.  For example, the D.C. Circuit in *Don't Tear It Down, Inc. v. Pennsylvania Ave. Dev. Corp.* suggested that preemption doctrine flows from the Supremacy Clause, and engaged in a preemption analysis, but also made clear that "[w]e need not undertake precise definition of the governmental status of the District of Columbia, for surely the preemption doctrine effects

---

[5] The court in *McKinney-Byrd* does not cite 28 U.S.C. § 1366, and the court in *District Property Associates* only obliquely references the text of Section 1983 as the basis for its decision.  While it may therefore be unclear to what extent those courts relied on these statutes in their analysis, it is clear that neither court raised or discussed the Supremacy Clause, and this court does not find those cases dispositive with respect to the Supremacy Clause question here.

[6] Plaintiffs cite *Cohens v. Virginia*, 19 U.S. 264 (1821), where Chief Justice Marshall held that "Congress is not a local legislature, but exercises this particular power, like all its other powers, in its high character, as the legislature of the Union." *Id.* at 429.  In that section of the opinion, the Supreme Court was considering its federal question jurisdiction—that is, whether the District of Columbia law at issue was considered a law of the United States sufficient to confer jurisdiction on the federal courts.  As has been discussed, later courts have held, contrary to *Cohens*, that such laws are not laws of the United States, and in any event Congress has withdrawn any such jurisdiction in 28 U.S.C. § 1366.  On the merits, the *Cohens* court also seemed to change course, explaining that the law in question applied only within the District, meaning Congress could not have meant it to affect any laws outside the District, including a contradictory law in Virginia.  Given the uncertainty of the court's treatment of the law at issue, and given that *Cohens* does not discuss the Supremacy Clause, it is of limited usefulness here.

District of Columbia legislation no less than state enactments." 642 F.2d 527, 534 n.65 (D.C. Cir. 1980). Likewise, the D.C. Circuit undertook a preemption analysis in *Firemen's Ins. Co. of Washington, D. C. v. Washington*, 483 F.2d 1323 (D.C. Cir. 1973), but did not reference the Supremacy Clause.

The seeming inconsistency between applying the preemption doctrine but not invoking the Supremacy Clause on which it is based is explained in *Maryland & D.C. Rifle & Pistol Ass'n, Inc. v. Washington*, 442 F.2d 123 (D.C. Cir. 1971) and *Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362 (Fed. Cir. 2007).

In *Rifle & Pistol Ass'n*, the D.C. Circuit considered whether the District had authority to issue gun control regulations, or whether Congress had reserved the field of weapons control solely to itself. The appellant argued that because Congress had passed a gun control law for the District, the District could not pass its own gun control regulations. The D.C. Circuit explained that the inquiry was "whether Congress, by enacting the 1932 gun control law, preempted the field so as to thereafter preclude the regulation of firearms by the District," or more importantly, "whether in [entering the same field] they have clashed." *Rifle & Pistol Ass'n*, 442 F.2d at 130. These are questions of field and conflict preemption—normally doctrines grounded in the Supremacy Clause. However, the D.C. Circuit explained that it was the relationship between the District and Congress as set out in the District Clause—not the Supremacy Clause—which drove the analysis:

> While the District is invested with broad authority to prescribe local regulations, the ultimate power to legislate for the District resides solely in Congress. . . . Congressional enactments prevail over local regulations in conflict with them, of course, and Congress may at any time withdraw authority previously delegated to the District, and any regulations dependent on the delegation then lapse. But, just as clearly, Congress may indulge the District in the exercise of regulatory powers, enabling it to provide for its needs as deemed necessary or desirable.

*Id*. at 129-30.  Thus, it was the withdrawal of delegated authority pursuant to the District Clause which formed the basis of the preemption analysis in *Rifle & Pistol Ass'n*, not Congress' enactment of the supreme law of the land.  The test the Court applied was whether Congress permitted concurrent authority or withdrew it, and "[t]he test of concurrent authority, this court indicated many years ago, is the absence of conflict with the legislative will.  As the court declared in *French v. District of Columbia*, where 'the subject (is) peculiarly within the scope of the (expressly delegated) police powers of the municipality, the exercise of authority ought not to be questioned unless clearly inconsistent with the expressed will of Congress.'"  *Id*. at 130-31 (quoting *French v. District of Columbia*, 32 App. D.C. 106, 108 (D.C. Cir. 1908)).

The Federal Circuit succinctly described this relationship as follows:

> The plaintiffs argue that the Act cannot stand because it is preempted by superior federal law.  While this case implicates supremacy principles, we note that it does not deal with an alleged conflict between a state regulation and a federal law requiring the application of the Constitution's Supremacy Clause.  The District of Columbia is federal territory whose self-governance is authorized by Congress, so the [local legislation] is in some sense a form of federal regulation.  Nevertheless, as between District statutes and superior enactments by Congress, the general principles of preemption from Supremacy Clause law apply.

*Biotechnology Indus. Org.*, 496 F.3d at 1371 (internal citation omitted).  Therefore, while the analysis has all the trappings of the Supremacy Clause, the Supremacy Clause itself does not apply.  Acts of Congress applicable exclusively to the District do not preempt local legislation because they are the supreme law of the land under the Supremacy Clause, but instead because they are the "supreme" law of the District under the District Clause.[7]  However, Supremacy Clause-like preemption doctrine is important in such cases because the analysis is essentially the same, with the question being whether Congress intended its enactment to be superior or not.

---

[7] This assumes, of course, that Acts of Congress are in fact superior to local laws, as discussed above.

The upshot for Plaintiffs is that while their claim will receive similar analysis either way, that analysis is only appropriate pursuant to the District Clause under Count I. Count II must be dismissed because the Supremacy Clause does not apply here.

This result is appropriate for a number of reasons. The first is that the text of the Supremacy Clause itself opens by stating that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2. For the Supremacy Clause to apply, laws that apply exclusively within the District would need to be considered "Laws of the United States." The measure of "[w]hether the District of Columbia constitutes a 'State or Territory' within the meaning of any particular . . . constitutional provision depends upon the character and aim of the specific provision involved." *District of Columbia v. Carter,* 409 U.S. 418, 420 (1973). As discussed above, numerous cases have held that laws that apply exclusively to the District are not laws of the United States for Section 1983 or federal question jurisdiction purposes,[8] and Congress has exempted D.C. legislation as "laws of the United States" for federal question purposes. This distinction is sensible when considering the difference between normal Acts of Congress and enactments for the District. Given the failures of the Articles of Confederation in resolving differences between the states and the federal government, the Constitution made supreme those laws passed in Congress' customary role as national legislature to effectuate our federal system of government and make clear that the states could not override the will of the federal government. Laws that

---

[8] *See also Key v. Doyle*, 434 U.S. 59, 68 n.13 (1977) ("It is more the nature of the D.C. Code than its limited geographical impact that distinguishes it from other federal statutes. Unlike most congressional enactments, the Code is a comprehensive set of laws equivalent to those enacted by state and local governments having plenary power to legislate for the general welfare of their citizens.").

apply exclusively within the District, by contrast, have no effect outside the District, and can never truly conflict with other Congressional enactments (as state laws might) because Congress always has final authority within the District.

The second clause of the Supremacy Clause states that "the Judges in every State shall be bound [by the supreme law of the land], any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., art. VI, cl. 2.  While sometimes treated as one for limited purposes, ultimately the District is not a state.  *See Palmore v. United States*, 411 U.S. 389, 395 (1973).  Therefore, it is questionable whether there are any state judges in the District bound by the Clause, or whether there is a state constitution or state laws that could ever be in conflict with the supreme law of the land.  Indeed, given that at the time the Constitution was enacted there was no District legislature to pass laws that could conflict with Congress, *see Marijuana Policy Project*, 304 F.3d at 83 ("For most of the first 171 years following the District of Columbia's 1802 incorporation, Congress exercised 'exclusive' authority over the District through direct legislation and appointment of local governors with no input from residents."), it is hard to fathom that the Founding Fathers intended the Supremacy Clause to apply to the District where the only District laws that could exist were Congress' own laws passed pursuant to the District Clause.

Application of the Supremacy Clause is further complicated by the fact that Congress must approve, albeit passively, D.C. Council legislation.  Under the Home Rule Act, Congress has thirty days to veto Council legislation before it automatically becomes law.  As other courts have noted, there is inherent difficulty in assuming that the Supremacy Clause applies to Acts of

Congress vis-à-vis other Acts of Congress,[9] or that a law that Congress approves, even passively, can be superseded by a different Congressional law pursuant to the Supremacy Clause.[10] *See Barnes v. District of Columbia*, 611 F. Supp. 130, 134-35 (D.D.C. 1985) ("It is difficult to reconcile this control exercised by Congress and its implicit approval of the legislation with the concept that a law subject to the 30-day review period violates the Supremacy Clause.").

For all these reasons, the court finds that the Supremacy Clause does not apply to Acts of Congress applicable exclusively to the District. Defendants' motion to dismiss Count II is therefore granted.

    c.  <u>School Reform Act</u>

The parties agree that Count III, alleging violation of the School Reform Act, rises and falls with Counts I and II. Defendants argue that because the District has authority to amend or repeal the School Reform Act, the District cannot have violated it. Because the court finds that Count I survives because Plaintiffs have pled a plausible claim for relief, and because the exact boundaries of the District's actions under the School Reform Act and whether they are permissible under the Home Rule Act remain unclear, the court similarly finds that Plaintiffs have pled a violation of the School Reform Act sufficient to survive a motion to dismiss.

---

[9] *See Calloway v. District of Columbia*, 216 F.3d 1, 5-6 (D.C. Cir. 2000) ("Even assuming the Supremacy Clause applies to Congress when it legislates for the District under Article I, section 8 of the Constitution—a proposition for which we have found no persuasive support—the families' argument suffers from a fatal weakness: it requires us to believe that Congress enacted section 130 for the purpose of having it instantaneously preempted by a statute enacted over a decade earlier.").

[10] The court will not opine on the applicability of the Supremacy Clause as between District laws and federal legislation. It is enough to say that under these circumstances—a purported conflict between an Act of Congress that applies solely to the District and D.C. Council legislation—the Supremacy Clause does not apply.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted with respect to Count II and denied with respect to Counts I and III.  An appropriate Order accompanies this Memorandum Opinion.

Date: September 30, 2015

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge