## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| D.C. ASSOCATION OF CHARTERED PUBLIC SCHOOLS, *et al.*, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 14-cv-1293 (TSC) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiffs allege that the District of Columbia has provided inequitable funding to the District's public charter schools in violation of the School Reform Act and the Home Rule Act. In October 2015, this court granted in part Defendants' motion to dismiss.  (ECF No. 31). Plaintiffs have moved for summary judgment on their remaining two claims, and Defendants cross-moved for summary judgment.  (ECF Nos. 43, 46 ("Defs. Mem.")).  For the reasons stated herein, Plaintiffs' motion is DENIED and Defendants' cross-motion is GRANTED.

## I.     BACKGROUND

### A.   Statutory Framework and the District's School Funding Practices

This case fundamentally involves the *sui generis* nature of Congress's and the District's complex and co-existing authority to legislate on local issues within the District.  Article I, Section 8 of the U.S. Constitution ("the District Clause") vests Congress with the authority to "exercise exclusive Legislation in all Cases whatsoever" over the District of Columbia.  U.S. Const. art. I, § 8, cl. 17.  For most of its history, Congress exercised this legislative authority and

governed the District directly.[1]  In 1973, in order to "relieve Congress of the burden of

legislating upon essentially local District matters," Congress passed the District of Columbia

Self-Government and Governmental Reorganization Act (the "Home Rule Act"), which created

the D.C. Council and "delegate[d] certain legislative powers to the [District]."  Pub. L. No. 93-

198, 87 Stat. 774 (1973) (codified as amended at D.C. Code § 1-201.01 *et seq.*).

The D.C. Council may act within its delegated legislative authority on matters pertaining

to the District, and Congress has thirty days to review each act of the Council, during which time

it may disapprove the legislation by passing a joint resolution.  D.C. Code § 1-206.02(c)(1).

Congress must also affirmatively approve or reject the District's budget requests.  *Id.* § 1-204.46.

The Home Rule Act further provides that the Council "shall have no authority to . . . [e]nact any

act, or enact any act to amend or repeal any Act of Congress, which . . . is not restricted in its

application exclusively in or to the District."  *Id.* § 1-206.02(a)(3).  The District argues that this

clause means that Congress in fact delegated authority to amend or repeal acts of Congress that

*do* apply exclusively to the District.  Congress may also "enact[] legislation for the District on

any subject, whether within or without the scope of legislative power granted to the Council by

this chapter, including legislation to amend or repeal any law in force in the District prior to or

after enactment of this chapter and any act passed by the Council."  *Id.* § 1-206.01.

This case centers on the D.C. School Reform Act of 1995 (the "School Reform Act" or

"Act"), which overhauled the District's public education system by establishing public charter

schools and further requiring the creation of a uniform formula to annually fund both charter

schools and D.C. Public Schools ("DCPS").  Pub. L. No. 104–134, 110 Stat. 1321 (1996)

---

[1]  For a thorough overview of the history of the District's creation and governance, see *Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C. 2000).

(codified as amended at D.C. Code § 38-1800.01 *et seq.*).  Section 2401, at issue here, is titled

"Annual Budgets for Schools," and directs that the formula must account for the amount of

"[t]he annual payment to the Board of Education for the operating expenses of [DCPS]" and

"[t]he annual payment to each public charter school for the operating expenses of each public

charter school."  D.C. Code § 38-1804.01(b)(1)(A)–(B).  Congress left the key term "operating

expenses" undefined in the statute, and, despite subsequent amendments to the Act, has never

defined the term.  The statute provides only that the Mayor and Council, in consultation with the

Board of Education and the Superintendent, shall establish the formula.  *Id.* § 38-1804.01(b)(1).

The District must then calculate the annual formula allotment for DCPS and each public charter

school by multiplying a uniform dollar amount by the number of students within DCPS and for

each charter school.  *Id.* § 38-1804.01(b)(2).

Pursuant to Congress's command in the School Reform Act, the District enacted the

Uniform Per Student Funding Formula ("UPSFF").  D.C. Law 12-207 (1998) (codified at D.C.

Code § 38-2901 *et seq.*).  Under the UPSFF, the formula "appl[ies] only to operating budget

appropriations from the District of Columbia General Fund for DCPS and for Public Charter

Schools" and does "not apply to funds from federal or other revenue sources, or to funds

appropriated to other agencies and funds of the District government."  D.C. Code § 38-2902(b).

For nearly two decades, the UPSFF has used a "foundation level" amount, which is the District's

determination of the cost of providing education to each student.  *Id.* §§ 38-2903, 38-2901(5).

The foundation level is adjusted based on grade level and other student characteristics, and is

multiplied by the number of students in DCPS or each charter school to determine the total

UPSFF appropriation for each year.  *See id.* §§ 38-2902(a), 38-2904, 38-2905, 38-2905.01, 38-

2906(a)–(b).

Under District law, DCPS is an executive agency.  *Id.* § 38-172.  DCPS receives its annual UPSFF appropriation, which accounts for central administration and support costs, in a yearly lump sum during the city's budget process in October.  *Id.* § 38-2906(a).  While a DCPS school's enrollment may change later in the year, the formula appropriation amount remains the same.  *Id.* §§ 38-2906(a), 38-1804.03.  The District points out that "[t]he DCPS operating budget is, however, subject to reprogramming, the same as all other District agencies [and] likewise, Anti-Deficiency Act requirements prohibit DCPS from carrying over operating funds from year to year."  (Defs. Mem. at 15 (citing D.C. Code §§ 47-365, 1-204.46)).  "Public charter schools are not subject to these constraints."  (*Id.* at 15 n.22).  While traditional D.C. public schools receive an annual payment, the District pays public charter schools their UPSFF appropriations quarterly, in July, October, January, and April.  D.C. Code §§ 38-2906.02, 38-1804.03.  The first payment is based on each school's projected enrollment, while the second and third are based on the school's October enrollment report, and the final payment is based on the results of the annual enrollment audit.  *Id.* § 38-2906.02(b)(1)–(4).  Separate from these payments, charter schools may receive supplemental allocations if they enroll or identify students entitled to special education or English language learner services after the audit.  *Id.* § 38-2906.02(d)(1)(A). According to the District, such adjustments are not available to DCPS.  (*See* Defs. Mem. at 16).

The District also regularly pays out supplemental and/or non-formula appropriations to DCPS and public charter schools, related to increases or decreases in grant funding or other budgetary needs.  In 2012, for example, the District enacted a supplemental appropriations bill that provided over $27 million to DCPS to cover budget shortfalls.  (ECF No. 43-2 (Plaintiffs' Statement of Material Undisputed Facts ("PSMF")) ¶¶ 77–80; Pls. Ex. 11 at D-2; Pls. Ex. 3 at D-19; Pls. Ex. 5 at 2).  In 2014, DCPS received a supplemental appropriation of nearly $10 million,

and in 2015 it received nearly $7 million.  (PSMF ¶¶ 81–86; Pls. Ex. 11 at D-22; Pls. Ex. 21 at

D-28; Pls. Ex. 15 at E-1; Pls. Ex. 26 at D-14).  The District's 2013 revised budget request

increased funding to charter schools and DCPS by $2 million, with the funding to public charter

schools being distributed "equally" instead of under the UPSFF.  *See* D.C. Law 20-14, § 2.  The

District also provided several examples of non-formula appropriations to individual charter

schools between 2011 and 2015.  (*See* Defs. Mem. at 17–18 (listing appropriations)).

The District also submitted examples of non-formula expenditures and services provided

to DCPS and charter schools, including on-site school nurses upon request from the D.C.

Department of Health, crossing guards provided by the D.C. Department of Transportation near

DCPS and charter schools, security officers provided by the Metropolitan Police Department,

and mental health services through the D.C. Department of Behavioral Health.  (Defs. Mem. at

18–19).  Plaintiffs do not challenge any of these non-formula expenditures.  The District divides

facilities maintenance costs between DCPS, which pays for custodial teams to perform routine

maintenance out of its formula appropriation, and the D.C. Department of General Services

("DGS"), which provides repair and maintenance services for all District-owned properties,

including those used by DCPS, through appropriations not included in the formula calculation.

(*See* Defs. Ex. 10; D.C. Code § 10-551.02(4)).  Plaintiffs challenge these appropriations to DGS.

The District also pays each charter school $3,100 per student annually for facilities expenses,

apart from the formula appropriation, D.C. Code § 38-2908(b-2)(2), and Plaintiffs do not

challenge these non-formula appropriations.

Finally, the District contributes to the DCPS Teachers' Retirement Fund, as first required

by Congress in the D.C. Retirement Reform Act of 1979.  Pub. L. No. 96-122, § 123, 93 Stat.

866, 872–75.  Since 1997, the District has paid the entirety of these funds to the Retirement Fund

as part of its annual budget process, which is separate from the formula calculations.  *See* D.C.

Law 12-152 (1998); D.C. Code § 1-901.01; Balanced Budget Act of 1997, Pub. L. No. 105-33, §

11002, 111 Stat. 251, 715–16.

### B.      Procedural History

Plaintiffs—two District charter schools and an association that represents 39 District

charter schools—brought suit in July 2014, alleging that the District has creatively circumvented

the funding formula described above in order to supplement DCPS's budget, to the detriment of

charter schools.  On October 1, 2015, in a written Opinion, this court granted Defendants'

motion to dismiss Plaintiffs' Supremacy Clause claim and denied the motion with respect to the

Home Rule Act and School Reform Act claims.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine dispute of any material fact

and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex

Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir.

2005).  In determining whether a genuine issue of material fact exists, the court must view all

facts in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S.

654, 655 (1962)).  The movant must rely on materials in the record to demonstrate the absence of

any genuinely disputed issues of material fact.  Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at

323.  The nonmoving party, in response, must present evidence beyond the pleadings of specific

facts showing that there is a genuine issue for trial.  *Celotex Corp.*, 477 U.S. at 324.  A fact is

material if "a dispute over it might affect the outcome of a suit," and an issue is genuine if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).  The non-movant is "required

to provide evidence that would permit a reasonable jury to find" in his or her favor.  *Laningham*

*v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (citations omitted).

## III.   DISCUSSION

Plaintiffs challenge the District's educational funding on two grounds.  First, in Count I

of their Complaint, they allege that the District has exceeded its authority under the Home Rule

Act by enacting legislation and making budgetary appropriations that conflict with and

contravene the School Reform Act.  (ECF No. 1 ("Compl.") ¶¶ 79–84).  Second, in Count III,

Plaintiffs allege that the District's funding enactments and practices violate the School Reform

Act's requirement to apply a uniform funding formula.  (*Id.* ¶¶ 90–92).  The parties have filed

cross-motions for summary judgment on both of these claims, and neither party has identified

genuine disputes regarding any material fact.  As this court noted in its prior Opinion, the two

claims rise and fall together, and there are two issues that would aid the court's analysis:  first,

whether "Congress left the Council with the discretion to take actions in addition to or outside of

the funding formula" such that the District's actions do not violate the School Reform Act; and

second, whether relevant provisions of the Act "ha[ve] been amended or repealed by Council

enactments (through Congressional acquiescence or otherwise)."  (ECF No. 32 ("MTD Op.") at

22–23).

### A.   Compliance with the School Reform Act

The court first considers whether the District's practices conflict with the text of the

School Reform Act—i.e., whether the Act restricts the District's ability to provide any funding,

either directly or indirectly, to DCPS outside of the funding formula.  In its prior Opinion, this

court concluded that "[a] facial reading of the text of the School Reform Act . . . leaves little room to doubt that Congress intended for the District to use the uniform funding formula, and did not anticipate the Council amending or repealing it." (*Id.* at 17).  However, this court also noted that "Congress thus did not intend to take over the D.C. public school system or withdraw the authority of local officials to run that system," but instead "set up the foundation of a system which it hoped the District could then build upon to improve outcomes in local public education." (*Id.* at 22).  The court now attempts to reconcile these conclusions and determine whether the District has built on the foundation Congress created, or discarded it.

Plaintiffs allege that the District's budget appropriations to charter schools and DCPS are not based on an equal funding formula in violation of section 2401 of the School Reform Act. More specifically, Plaintiffs take issue with three non-formula sources of funds for DCPS— (1) the District's provision of supplemental appropriations to cover budget shortfalls, (2) the District's contributions to the Teachers' Retirement Fund, and (3) the District's appropriations to DGS.  Plaintiffs also take issue with the methodology used to count students when calculating formula payments.  The District does not dispute that it provides funding in these ways, but argues that the funding does not violate the School Reform Act.

    1.   Non-Formula Budget Appropriations

Plaintiffs first argue that the District's appropriations to DGS and the Teachers' Retirement Fund, and any supplemental appropriations made directly to DCPS, violate the School Reform Act by circumventing the formula calculation.  Plaintiffs' interpretation of the School Reform Act appears to be quite narrow; they contend (1) that the Act provides the exclusive means of funding all costs associated with both DCPS and charter schools; (2) that the District may not spend funds on public schools or charter schools apart from the annual formula

calculation; and (3) that once the annual formula payment is calculated, no other payments can be made (apart from certain limited exceptions) to charter schools or DCPS, regardless of the need or circumstance.  The District argues that the School Reform Act requires the use of a formula to set a certain baseline per-pupil budget, but that nothing in the text or legislative history prohibits other funds from being spent on education.

In light of Congress's goal of creating the Home Rule Act to "relieve Congress of the burden of legislating upon essentially local District matters," Pub. L. No. 93-198, § 102, 87 Stat. 774 at 777, Plaintiffs' interpretation would be a rather extreme restriction of the District's ability to manage its budget process with respect to any and all educational spending.[2]

The relevant section of the School Reform Act provides in part:

**SEC. 2401. ANNUAL BUDGETS FOR SCHOOLS.**

(a)  In General.  For fiscal year 1997 and for each subsequent fiscal year, the Mayor shall make annual payments from the general fund of the District of Columbia in accordance with the formula established under subsection (b).

(b)  Formula.

    (1)  In General.   The Mayor and the District of Columbia Council, in consultation with the Board of Education and the Superintendent, shall establish not later than 90 days after enactment of this Act, a formula to determine the amount of—

        (A) the annual payment to the Board of Education for the operating expenses of the District of Columbia public schools, which for purposes of this paragraph includes the operating expenses of the Board of Education and the Office of the Superintendent; and

        (B) the annual payment to each public charter school for the operating

---

[2]  Plaintiffs undermine their own argument regarding the rigidity of the formula calculation. They argue that the statute's use of the words "the annual payment" mandates a singular formula calculation, and Plaintiffs' counsel stated at oral argument that "Congress intended there should be no other" exceptions beyond the two expressly referenced in the Act.  However, when asked by the court about unexpected or emergency budget needs, Plaintiffs appeared to invent a new exception in the statute, responding that the District could simply make supplemental payments apart from "the annual payment" and "simply follow the formula."  (ECF No. 56 ("Tr.") at 6:21–7:3).  Counsel did not provide the authority for this new exception, and the court is not aware of any.  Instead, it appears that Plaintiffs partially conceded that the Act must provide some flexibility for the District to sufficiently manage and fund its educational system.

expenses of each public charter school.

(2)  Formula calculation.  Except as provided in paragraph (3), the amount of the annual payment under paragraph (1) shall be calculated by multiplying a uniform dollar amount used in the formula established under such paragraph by—

(A) the number of students calculated under section 2402 that are enrolled at District of Columbia public schools, in the case of the payment under paragraph (1)(A); or

(B) the number of students calculated under section 2402 that are enrolled at each public charter school, in the case of a payment under paragraph (1)(B).

Pub. L. No. 104–134, § 2401(a)–(b), 110 Stat. 1321 at 136–37; *see also* D.C. Code § 38-1804.01(a)–(b).  The text references "annual payments" that are "in accordance with the formula."  The statute does not, however, contain language indicating that these payments must be the *only* payments made to DCPS or charter schools.  Nonetheless, Plaintiffs argue that Congress's intent to restrict the District's ability to issue non-formula appropriations can be implied from the language of the statute.  The School Reform Act requires the Mayor and Council to establish a formula to determine "*the* annual payment" to the Board of Education and for each public charter school "for *the* operating expenses" of DCPS and the charter schools.  Plaintiffs argue that Congress's use of the definite article "the" before the words "annual payment" and "operating expenses" must be interpreted to be limiting and singular, such that the District may only make one annual formula appropriation to DCPS and each charter school, which must cover all expenses associated with operating the schools.  (ECF No. 43-1 ("Pls. Mem.") at 20–21 (citing *Noel Canning v. NLRB*, 705 F.3d 490, 500 (D.C. Cir. 2013) and *Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000))).

In the court's view, Congress's choice of the article "the" cannot bear the weight of so much meaning.  Section 2401(a) of the School Reform Act clearly provides that the District must make "annual payments from the general fund."  Defendants argue that Congress's references to

"*the* annual payment" in the following subsection, section 2401(b), simply refer to the annual payments referenced in the preceding section of the statute, section 2401(a), instead of operating substantively as a limitation on funding.  Defendants' construction appears to be the better reading of the statutory language.  Nowhere in the School Reform Act did Congress specify that the annual formula payment must be the only appropriation made, nor does the language even suggest that other payments may not be made as necessary.  The court agrees with the District that nothing more can or should be read into the choice to use "the" before "annual payment" in sections 2401(b)(1)(A) and (B) of the School Reform Act, other than that the formula provided for in section 2401(b) is to be used to calculate the "annual payments" referenced in section 2401(a).

Plaintiffs additionally point out that section 2401(b)(3) provides for two "exceptions," and specifies that the "annual payment" may be adjusted based on the students' grade levels and the costs of serving students with special needs or those who have not met certain literacy standards.  Pub. L. No. 104–134, § 2401(b)(3), 110 Stat. 1321 at 137.  Plaintiffs contend that these exceptions are the only deviations from the normal formula that the District is permitted to make under the statute.  But this reading constrains the plain text.  As provided in section 2401(b)(2), the formula is to be based on a "uniform dollar amount" per student.  Pub. L. No. 104–134, § 2401(b)(2), 110 Stat. 1321 at 137.  When section 2401(b)(3) is read in the context of this requirement—as it must be, given that the subsection begins with "[n]otwithstanding [section 2401(b)(2)]"—the fact that the Act provides for the ability to modify the per-student dollar amount based on individual student characteristics, such as grade level, appears to indicate nothing at all as to whether the formula appropriation must be the *exclusive* means of funding the District's educational system.

Plaintiffs further assert that "[h]ad Congress intended to allow Defendants to fund some operating expenses through the funding formula and others outside the formula, it could have left the term 'operating expenses' unqualified and open to interpretation." (Pls. Mem. at 21). However, the Act *does* leave the term undefined, indicating that this was Congress's intent. The court therefore agrees with the District that the School Reform Act's express language does not require a single exclusive appropriation to either DCPS or charter schools based on the formula.

The court now turns to the legislative history to discern whether Congress intended the funding formula to be the exclusive mechanism for funding DCPS and charter schools. The Senate Report accompanying the School Reform Act explained that "changes [to the District's schools] must come from the local community, with every part, including the Congress, pitching in. What the Congress can do, and has a responsibility to do, is to create a structure within which change and reform will take place." S. Rep. No. 104-144, at 6 (1995); *see also* H.R. Rep. No. 104-455, at 146 (1996) (restating issues addressed by the School Reform Act). The House Report accompanying the District of Columbia Appropriations Bill of 1997 explained what costs it envisioned including in the funding formula. H.R. Rep. No. 104-689, at 50 (1996).[3]  Congress wrote that "the funding formula . . . must include the total costs of the operations of the Board of Education itself, all central administration and central office costs, including those applicable to the Superintendent of Schools, all facilities operating costs, including utilities, all local education agency evaluation, assessment, and monitoring costs, and any other direct or indirect costs normally incurred by, or allocated to, schools under the control of the Board of Education and

---

[3]  Defendants argue that the court should not consider this House Report because it was issued after the School Reform Act was passed, and thus is not a part of the Act's "legislative history." However, the House Report was written by the same 104th Congress that passed the School Reform Act and is otherwise relevant, as it accompanies the D.C. Appropriations Bill approving the District's funding formula.

the overall public school system." *Id.* As with the Senate and House Reports accompanying the School Reform Act itself, this House Report did not specify whether the funding formula is to be the *exclusive* means of funding DCPS or charter schools or what the full scope of the "operating expenses" that must be included in the funding formula should be.

Both parties cherry pick and choose stray language from this legislative history to support their position. For example, Plaintiffs note that the 1996 House Report stated that "the funding formula . . . must include . . . all facilities operating costs . . . and any other direct or indirect costs," *id.*, which could suggest that the budget allocations to DGS and to the Teachers' Retirement Fund should be included in the funding formula calculation. However, this same paragraph describes these requirements as applying to the "annual payments *derived from per pupil allocations* to both public charter schools and public schools," *id.* (emphasis added), which may also plausibly suggest that Congress envisioned other, non-per pupil allocations, and was distinguishing from those.

Similarly, Congress appeared to suggest that contributions to the Teachers' Retirement Funds and allocations spent on "school repairs" are distinct from the funding formula, as the House Report listed the total "operating expenses" for the "Board of Education (Public Schools)" on a separate line from "Schools Repairs" and "Teachers' Retirement System" allocations. *Id.* at 48. That Congress separated these line items from DCPS operating expenses in the House Report offers some support for the District's practice of allocating those funds outside of the formula.

The District also offers statutory and historical context for these non-formula appropriations. First, the District notes that its separate appropriations to DGS for facilities maintenance and repair of DCPS buildings stem from the School Reform Act

itself, which required that DCPS contract with the federal Government Services Administration for "technical assistance and related services" in the "repair and improvement" of DCPS school buildings.  Within twelve months after the date of the enactment of the Act, DCPS was to create or designate another agency or entity to "assume authority and responsibility for the repair and improvement, and maintenance and management, of [DCPS buildings]."  Pub. L. No. 104-134, § 2550–52, 110 Stat. 1321 at 141–43.  These facilities costs described in the School Reform Act are different from day-to-day maintenance of DCPS facilities, which the District considers to be operating expenses within the meaning of the Act and which are included in the funding formula. (Defs. Ex. 10 ¶¶ 4–6); *see also* DCPS School Budget Guide, Custodial Guidance.[4]  The District thus argues that Congress intended the annual amounts allocated to DGS to fall outside of the funding formula calculation and to be separate from DCPS's "operating expenses."

With respect to the non-formula contributions to the Teachers' Retirement Fund, the District argues that it has made such contributions to the retirement fund outside of direct budget allocations to DCPS for decades, *see* Pub. L. No. 96-122, § 123, 93 Stat. 866, 872–75 (1997) (establishing D.C. Teachers' Retirement Fund), and that at the time the School Reform Act was passed, such contributions were made to and managed by the D.C. Retirement Board.  (ECF No. 45 ("Council Amicus Br.") at 16–17).  There is little evidence that Congress intended for the District to alter its budget practices and re-route these funds through the funding formula, especially given that the House Report to the D.C. Appropriations Bill of 1997, which approved

---

[4]  *Custodial Guidance*, DCPS FY2017 School Budget Guide,
http://www.dcpsschoolbudgetguide.com/changes/custodial.html.

the District's first funding formula, listed Teachers' Retirement Fund contributions separately

from the DCPS operating costs.  Moreover, the House Report stated that the funding formula

must contain "any other direct or indirect costs *normally incurred by, or allocated to*" DCPS,

H.R. Rep. No. 104-689, at 50 (emphasis added), which further suggests that Congress did not

intend to alter the District's practice of allocating funds to the Teachers' Retirement Fund

separately from DCPS.  Plaintiffs attempt to draw a distinction between retirement contributions

for teachers currently teaching at DCPS as part of their compensation benefits and contributions

for teachers who have already retired.  However, there appears to be little basis for the court to

conclude that Congress intended such a distinction, as the text and legislative history are wholly

silent on this issue.

Finally, on the question of whether the District may make supplemental appropriations as

necessary to DCPS as a local government agency, the District notes that the federal Anti-

Deficiency Act (31 U.S.C. § 1341 *et seq.*) ("ADA") and anti-deficiency provisions in the Home

Rule Act prohibit DCPS from overspending its allocated budget.  The District contends that, as a

result, in the event of a budget shortfall, it has no choice but to issue a supplemental

appropriation because DCPS may not otherwise spend money it has not been appropriated.

Given the strict overspending prohibition in the ADA, without such a supplemental

appropriation, DCPS might be forced to curtail or cease operations in the event of such an

unexpected shortfall.  The court agrees with Plaintiffs that the ADA is not meant to facilitate

overspending, but rather to require agencies to stick to a budget.  However, the application of the

ADA to District agencies such as DCPS and the general availability of supplemental

appropriations to cover shortfalls for other agencies provide helpful context when considering

whether Congress intended to limit the District to one annual budget appropriation without the

possibility of supplemental appropriations.  Given the legislative history discussed above, the answer to that question appears to be no.

There is simply no clear language in the statute or the legislative history to support the conclusion that the formula was required to be the exclusive funding mechanism for the District's educational system, and as a result, the court finds that there is no basis for concluding that the District's appropriations are unlawful.

The parties also disagree on whether this court should defer at all to the District's interpretation and implementation of the School Reform Act.  Plaintiffs argue that the text of the Act is clear and therefore the District has no discretion to interpret the term "operating expenses."  They further contend that "[t]he SRA is neither silent nor ambiguous with respect to the requirement that Defendants fund all of DCPS' and D.C. Charter Schools' operating expenses through the UPSFF." (ECF No. 53 ("Pls. Rep.") at 26 n.29).  The court disagrees.  The Act *is* in fact silent as to which costs are included in the term "operating expenses."  Moreover, Congress required the District to weigh in by expressly delegating the creation of the formula itself to local officials.  In the court's view, some degree of deference for the District's long-standing interpretation of the Act's requirements is therefore appropriate.

Were the court reviewing a delegation to an agency, as opposed to the District, Congress's directive to create and implement a formula that includes "operating expenses" while leaving the term undefined would be an appropriate case for *Chevron* deference, since Congress would have explicitly left one gap to fill (the formula itself) and impliedly left another (the scope of "operating expenses").  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  This court would then assess whether the agency's interpretation was reasonable or permissible.  *See id.* at 842–43.

Alternatively, a court may give lesser deference to an agency's interpretation if there is no express delegation of authority to interpret a statute, but the agency's decisions still have the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Such deference is appropriate where the agency "can bring the benefit of specialized experience to bear on the subtle questions in th[e] case." *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001). Under this framework, courts are likely to defer to an agency's interpretation (1) if it is longstanding and parties have come to rely on it; (2) if it was adopted soon after the enactment of the relevant statute, especially if the agency itself was involved in the legislative drafting process; and (3) if the agency has demonstrated the requisite degree of care and formality. *See id.* at 228 ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."). All of these circumstances are present here.

Plaintiffs argue that because the District is not an agency, *Chevron* review is inappropriate, as it is limited to the decisions and actions of federal administrative agencies acting under authority delegated by Congress. The court agrees. The District's *sui generis* nature as a municipality that has Congressional oversight suggests that, at most, both *Chevron* and *Skidmore* should be persuasive. However, two prior decisions of this Circuit regarding preemption suggest that the District may still regulate "interstitially" around Congressional statutes, and may also be entitled to some degree of deference when doing so. First, in *Maryland & District of Columbia Rifle & Pistol Ass'n v. Washington*, the Circuit stated that it could not "agree that municipal regulation is precluded simply because the legislature has taken some action in reference to the same subject." 442 F.2d 123, 130 (D.C. Cir. 1971). Next, in *Firemen's*

17

*Ins. Co. of Washington v. Washington*, the Circuit wrote:

> Given the potentially greater responsiveness of local government to local problems and the recognition that Congress cannot realistically be expected to deal with every aspect of a local problem, the court [in *Pistol Association*] determined that the municipality should be given the benefit of that reasonable doubt and upheld the local regulation.  Here there is at least a reasonable doubt whether Congress meant to totally pre-empt the field of insurance regulation by enactment of the Insurance Code.   We therefore conclude that the local government may legislate interstitially—to fill the gaps in the statutory scheme.

483 F.2d 1323, 1329 (D.C. Cir. 1973).  The court finds the *Firemen's Insurance* framework of determining whether there is "reasonable doubt" about a statute's reach and then determining whether to "give the benefit of that reasonable doubt" to the District's interpretation to be an appropriate approach here.  Given the ambiguity in the text and legislative history of the School Reform Act, the court finds that there is a reasonable doubt as to whether Congress intended to strip the District of the power to determine which expenses are included in the formula.  As in *Firemen's Insurance*, the court finds that such reasonable doubt means that the District may legislate interstitially, where necessary, around the School Reform Act.  Consequently, the District may make determinations and legislate about what costs are included within the term "operating expenses."

Having decided that the District has the ability to legislate interstitially here, the court must still decide whether to afford the District any deference for its legislative decisions.  Here, the court finds the *Skidmore* framework to be an appropriate guide.  Because there is significant persuasive authority in the District's decades-long, consistent interpretation and implementation of the funding formula, and because the statutory text and legislative history are not clear, the court agrees that the District's practice of making non-formula supplemental budget appropriations and non-formula budget allocations to

18

DGS and to the Teachers' Retirement Fund does not clearly violate the School Reform Act.

What is apparent from the text of the statute and from the legislative history cited by both parties, and what this court already concluded in its earlier Opinion, is that Congress intended for the District to use a formula to fairly fund education in the city.  Since the court finds that it is unclear from the text of the statute whether Congress meant for this formula to be the exclusive, as opposed to primary, means of funding education, the court cannot conclude that the District's funding scheme clearly violates the School Reform Act's formula requirement.  Therefore, the court will GRANT the District's motion for summary judgment with respect to these appropriations.

        2.   <u>Calculation of Enrolled Students at DCPS and Charter Schools</u>

Plaintiffs also allege that the fact that the District uses different methods to calculate student enrollment at DCPS and charter schools violates the School Reform Act and results in inequitable and unlawful additional funding to DCPS.

DCPS receives an annual formula appropriation in a lump sum in October of each year based on "the total estimated costs for the number of resident students projected to be enrolled in DCPS during the fiscal year."  D.C. Code § 38-2906(a).  This projection is based on "the audited enrollment for the school year preceding the fiscal year for which the appropriation is made."  *Id.* Charter schools receive formula payments on a quarterly basis.  The first payment is based on projected enrollment, the second and third are based on actual reported enrollment, and the fourth is based on audited enrollment, and may be adjusted up or down to reflect changes in the charter school's student population.  D.C. Code § 38-2906.02(b).  Plaintiffs assert that by using actual, audited enrollment for charter schools and using projected enrollment for DCPS, the

District is violating the School Reform Act by applying different methodologies to public and charter schools.  While Plaintiffs do not allege that the use of audited enrollment results in underfunding of charter schools, they argue that the overfunding that results if DCPS has fewer students than projected violates their right to a uniform funding formula.

The District first argues that Plaintiffs lack standing to challenge the calculation methodologies because charter schools suffer no alleged injury in fact, noting that "an unlawful windfall to DCPS, even if proved, does not adversely affect [charter schools] in any 'concrete' way."  (Defs. Mem. at 39).  This court agrees.

To have standing to bring a particular claim, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted).  The injury in fact requirement "is a constitutional requirement, and '[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.'"  *Id.* at 1547–48 (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997)).  Plaintiffs must show that the District's calculation methodology for DCPS enrollment caused them to "suffer[] 'an invasion of a legally protected interest' that is 'concrete and particularized.'"  *Id.* at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

The primary issue here appears to be whether Plaintiffs' alleged injury is "concrete."  The District argues that it is not, because Plaintiffs do not allege (1) that a different methodology should be used to calculate the number of students enrolled in charter schools; (2) that they are being underfunded by the District's method of calculating DCPS enrollment; or (3) that success on this claim would result in any change in funding to charter schools.  Plaintiffs argue that the

School Reform Act "gives D.C. Charter Schools the right to receive operating expense funding based on the <u>same</u> formula that is used to calculate DCPS' operating expense funding," and that the District's calculation methodology "injures Plaintiffs by setting up an unequal playing field in the D.C. public education system."  (Pls. Rep. at 46 (emphasis in original)).

A "concrete" injury is one that is "real, and not abstract," though it may also be "intangible."  *Spokeo*, 136 S.Ct. at 1548–49 (internal quotation marks and citations omitted). Plaintiffs argue that the District's alleged violation of the School Reform Act violates their statutory right.  It is true that "Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute."  *Warth v. Seldin*, 422 U.S. 490, 514 (1975).  Court-recognized statutory rights include, for example, the right to receive information under the Freedom of Information Act, 5 U.S.C. § 552.  *See Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 617–18 (D.C. Cir. 2006) ("The requester is injured-in-fact for standing purposes because he did not get what the statute entitled him to receive.").  However, violations of statutory rights must still be coupled with a concrete injury, as "some statutory violations could 'result in no harm,' even if they involved [conduct] that violated the law."  *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 514 (D.C. Cir. 2016) (quoting *Spokeo*, 136 S. Ct. at 1550). As the Court stated in *Spokeo*, a plaintiff "[can] not . . . allege a bare procedural violation, divorced from any concrete harm."  136 S. Ct. at 1549; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing.").

Here, nothing in the Act appears to create a statutory right to the same calculation methodology.  Instead, the Act requires only the use of the same formula dollar amount

multiplied by the number of students.  With respect to their claims involving the three above-analyzed, non-formula funding practices, Plaintiffs have standing because they allege statutory and concrete injuries: They allege that the District violated their right to the same dollar amount per student and that they are being deprived of actual funding because, absent the non-formula funding practices, they would receive more formula funds.  However, with respect to the student calculation methodology claim, the court can identify no possible statutory injury because, as stated above, the School Reform Act does not appear to create any right to the same calculation methodology.  Additionally, because Plaintiffs do not allege that they are being underfunded as a result of the District's methodology or that a change in that calculation methodology would result in additional funds for charter schools, there appears to be no concrete injury.  As a result, Plaintiffs have not established the requisite elements of standing to bring this final claim. Accordingly, because Plaintiffs lack Article III standing, the court has no jurisdiction to consider the merits of whether the District's methodology for calculating student enrollment at DCPS violates the School Reform Act, as the court cannot "step[] where the Constitution forbade it to tread."  *Hancock*, 830 F.3d at 513.  The court will therefore GRANT the District's motion on Plaintiffs' claims involving the enrollment calculation.

### B.   The District's Authority to Amend the School Reform Act

The District argues that even if its funding and enrollment calculation policies violate the School Reform Act as enacted, the D.C. Council has the power, under the Home Rule Act, to amend or repeal certain provisions of the Act, with the practical implication being that the District cannot be in violation of the Act since it has the power to change it, and has done so. This issue was the primary focus of this court's previous Opinion and consumed much of the parties' briefing.  However, having found that the District is correct as a matter of law that its

funding practices do not violate the School Reform Act, and that the Plaintiffs have no standing to challenge the District's enrollment calculation method for DCPS, this court will not wade into the complex waters of defining the scope of the D.C. Council's legislative authority with respect to amending or repealing Acts of Congress that apply only to the District.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED and Defendants' cross-motion for summary judgment is GRANTED.


Date:  September 30, 2017


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge